No. 46,460

Donald McFeeters & Viola McFeeters; Raymond Wattenbarger & Carolyn Wattenbarger: Albert Etter & Barbara Etter; Warren Van Dyke & Evelyn Van Dyke; *Appellees*, v. M. W. Renollet and Renollet Homes, Inc., *Appellants.*

(500 P. 2d 47)

Opinion filed July 19, 1972.

*Owen J. Redmond, Jr.,* of Redmond and Redmond, of Wichita, argued the cause and was on the brief for the appellants.

*Roger Sherwood,* of Kahrs, Nelson, Fanning, Hite and Kellogg, of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

Kaul, J.: The four plaintiffs-appellees brought this action to recover damages resulting from the defective construction of basements in each of the houses which plaintiffs had purchased from

defendant-appellants, M. W. Renollet and Renollet Homes, Inc. After a jury trial, judgment was rendered in favor of each plaintiff against both defendants. Thereafter defendants perfected this appeal.

In their amended petition, plaintiffs alleged two causes of action, the first of which charged defendants with negligence in the construction of each of plaintiffs' homes. Plaintiffs further alleged that each home was built under the supervision and control of defendant M. W. Renollet, while acting as agent of Renollet Homes, Inc., and that due to his negligence the basement of each home was so constructed that during periods of normal rainfall, water leaked into the basement of each house, remained on the floor and caused damage to the floor and walls of each basement.

For their second cause of action against both defendants, plaintiffs alleged that defendants impliedly and expressly warranted that the homes being purchased by plaintiffs were reasonably fit for the purpose intended and free from defects. Plaintiffs further alleged that the homes were in fact defective and that defendants breached an implied and/or express warranty with each of the plaintiffs. Plaintiffs alleged that each of them had been damaged in the amount of $5,000 and prayed for judgment jointly and severally against defendants.

In their answer to plaintiffs' amended petition, the defendants denied negligence and further alleged that plaintiffs' first cause of action (negligence) was barred by the statute of limitations; and with respect to plaintiffs' second cause of action, defendants alleged that the homes described in plaintiffs' petition were warranted against defects for a period of one year and were not warranted thereafter.

After pretrial discovery proceedings, consisting of depositions and interrogatories, were completed a pretrial conference was held and a comprehensive order approved by counsel for both parties was filed. The pretrial order set out with specificity the stipulations of the parties, the claims of plaintiffs with respect to both defendants, and the questions of law and fact to be determined.

According to the pretrial order the parties stipulated that the homes were constructed under the supervision of M. W. Renollet and that during a period of time when he was hospitalized his wife, Marie Renollet, and his son, Calvin Renollet, also supervised con-

struction. It was also stipulated that the houses were not constructed with lateral lines.

The pretrial order further showed that plaintiffs relied on six acts of alleged negligence on the part of defendants, including failure to test the level of the water table at the homesites, failure to install lateral lines or to use other means to prevent basement leakage, and failure to comply with FHA regulations regarding prevention of basement water problems.

With respect to breach of contract, the pretrial order shows that plaintiffs relied on alleged breaches of their respective purchase contracts in defendants' failure to comply with the FHA specifications.

The case came on for trial to a jury on June 1, 1970. During the course of the trial, the court required plaintiffs to elect between the theories of implied warranty and breach of contract; plaintiffs elected breach of contract and the case was submitted to the jury on negligence and breach of contract with respect to both defendants.

The jury returned verdicts for McFeeters $3,318.80; Wattenbarger $3,098.96; Etter $3,292.76; and Van Dyke $3,086.96.

The evidence disclosed that defendant M. W. Renollet was President of Renollet Homes, Inc., a corporation engaged in the business of building houses in the Wichita area, particularly in the Southwest part of the city wherein the subject homes were constructed. The plaintiffs came in contact with M. W. Renollet when he showed each of them a model home constructed on the tract he was developing. Thereafter, on various dates from July 3, 1967, through August 19, 1967, each of the plaintiffs executed contracts with Renollet Homes, Inc. for the construction of houses similar to the model home. Three of the contracts provided that the houses were to be built in compliance with plans and specifications approved by the Federal Housing Authority, hereafter referred to as FHA. The remaining contract (McFeeters) provided that the house was to be built according to plans and specifications approved by the Veterans Administration, hereafter referred to as VA.

Plaintiffs moved into their respective homes between September 1967 and May 1968. In May 1969 each of the plaintiffs observed water seeping into their basements through small cracks in the basement floor and some water leaking in through the perimeter joint around the basement where the floor joins with the basement walls. Plaintiffs would remove the water but within a few hours it

would return and collect to a depth of one-half to one and one-half inches over the entire floor of each of plaintiffs' basements. Evidence of plaintiffs showed that water covered the basement floors during most of the summer of 1969, in spite of plaintiffs' repeated attempts to clear their basements of water. The water receded in the fall of 1969, but again appeared in March of 1970 and remained until the date of the trial in June 1970.

On appeal defendants specified five points of error, one of which pertaining to the bar of the statute of limitations, has been abandoned. In their brief defendants phrase the issues on appeal in this fashion:

"The principal questions to be decided upon this appeal fall into two general categories, one is the President of the corporation, M. W. Renollet liable in his individual capacity, and personally liable for acts of negligence as a corporate officer, Number two, is the corporation liable for negligence and breach of contract as claimed by the plaintiffs."

Defendants strenuously argue that defendant M. W. Renollet cannot be held to be individually liable; that his actions were those of a corporate officer only; and that the trial court erred in overruling his motion for judgment at the close of plaintiffs' case.

From our examination of the pleadings and the pretrial conference order, it appears that plaintiffs charged defendant Renollet personally with negligence, while supervising the construction of their homes in that (1) he failed to properly test or determine the water table on the homesites prior to commencing construction; and (2) he failed to install lateral drainage lines in compliance with FHA and VA specifications or to use alternative means to prevent leakage in the basements. Plaintiffs contended that Renollet failed to perform the duty he owed directly to them, to act with reasonable care once he undertook to act in supervising the construction of their homes.

It is true, as defendants suggest, that a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character. If, however, an officer commits or participates in the commission of a tort, whether or not it is also by or for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort. (19 Am. Jur. 2d, Corporations, § 1382, p. 778.) It is well settled in this jurisdiction that an officer or agent of a corporation who violates a duty owed to third persons is liable to such persons.

(*Duensing v. Leaman,* 152 Kan. 42, 102 P. 2d 992; and *Dowell v. Railway Co.,* 83 Kan. 562, 112 Pac. 136.) In *Russell v. American Rock Crusher Co.,* 181 Kan. 891, 317 P. 2d 847, we said:

"An agent cannot escape liability to third persons by pleading he acted at the command or on account of the principal. This is for the reason that the tort liability of the agent is not based on the contractual relationship between the principal and agent, but on the common law obligation that every person must so act or use that which he controls as not to injure another. . . ." (p. 895.)

In support of his position defendant Renollet cites the recent case of *Green v. Devoe Sales, Inc.,* 206 Kan. 238, 477 P. 2d 944. In that case plaintiffs Greens attempted to impress individual liability on Devoe Treadwell, President of Devoe Sales, Inc., for damages stemming from the fraudulent sale of a mobile home. The evidence disclosed that the transactions concerning the sale were between the Greens and various representatives of Devoe Sales, Inc. There was no evidence that Treadwell participated in the transaction other than in a representative capacity in executing the sales contract for the corporation in his capacity as president. We said:

". . . Generally corporation officers are not individually liable upon contracts wherein the corporate name is signed and is followed by the name of an officer of the corporation to which are added words denoting his representative capacity. (19 Am. Jur. 2d, Corporations, § 1345, p. 751.)." (pp. 245-246.)

The *Green* case is clearly distinguishable from the instant case wherein the evidence shows that M. W. Renollet personally participated in the tortious acts complained of. We have examined other cases cited by defendants and find them to be either distinguishable on the facts or not in point on the issue presented here.

Defendants next contend that as to Renollet Homes, Inc., the theories of contract, implied warranty and negligence were inconsistent and that the trial court committed reversible error in refusing to require plaintiffs to elect between their theories prior to the close of defendants' case when plaintiffs did elect to stand on negligence and breach of contract. The record is not clear as to precisely when the trial court required plaintiffs to elect. Plaintiffs claim the order to elect was made at the close of plaintiffs' evidence and further that in any event the order was erroneous since, under the evidence of this case, their theories were not inconsistent. Defendants, on the other hand, claim that the order to elect was not made until the close of their evidence and that they were put to disadvantage in attempting to defend against all three theories. The only reference to election made by the trial court which we are able to find in

the rather confusing record is a comment of the trial court at the close of defendants' evidence when, apparently, defendants renewed their motion. The trial court is quoted in the record as follows:

"And the Court did require, and has required, plaintiff to elect between his theories of breach of warranty and breach of contract. And plaintiff has elected to proceed on the theory of breach of contract, rather than breach of warranty when given that option by the Court. It was not a voluntary election on the part of the plaintiff, it was one after the Court ruled that, and I'm now recording that I did rule yesterday that he had to take an election. And I am not trying to preclude Mr. Sherwood from stating his opposition in that rule, I'm just stating the reasons for it now."

Regardless of when plaintiffs were required to elect, defendants have not shown prejudice. The positions of the parties, as shown in the pretrial order which governs the subsequent course of the action (*Evangelist v. Bellern Research Corporation*, 199 Kan. 638, 433 P. 2d 380; and *Brown v. Hardin*, 197 Kan. 517, 419 P. 2d 912) is that plaintiffs were claiming breach of implied warranty in substantially the same particulars as the acts of negligence alleged— thus defendants could not have been prejudiced in presenting their defenses. Actually there is no inconsistency in plaintiffs' theories as framed in the pretrial order in this case. This was not a situation such as appeared in *Lehigh, Inc. v. Stevens*, 205 Kan. 103, 468 P. 2d 177, wherein it was held that a litigant could not rescind a contract because of a breach of warranty and in a later action seek to recover damages for the same breach.

In the case at bar, plaintiffs, in order to establish breach of implied warranty, were required to show negligence on the part of defendants in failing to use due care and skill in performing the particular work involved. Thus, the theories of negligence, breach of implied warranty or contract, were not inconsistent as the issues were framed and presented here. We find appropriate this statement in the recent case of *Gilley v. Farmer*, 207 Kan. 536, 485 P. 2d 1284:

". . . Whatever the rule may be elsewhere, this court has been consistent in holding that where a person contracts to perform work or to render a service, without express warranty, the law will imply an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in doing the work. (*Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P. 2d 986.)

"Where negligence on the part of the contractor results in a breach of the implied warranty, the breach may be tortious in origin, but it also gives rise to a cause of action *ex contractu*. An action in tort may likewise be available

to the contractee and he may proceed against the contractor either in tort or in contract; or he may proceed on both theories. . . ." (p. 542.)

Defendants' next contention concerns the trial court's failure to instruct concerning an "act of God." The record does not disclose that a requested instruction was filed. However, we find a statement of the trial court, apparently made immediately before the case was submitted to the jury, as follows:

"The motion with respect to the instruction on act of God is overruled on the basis that the Court doesn't feel there is any evidence in the case to sustain such an instruction."

Assuming the matter was properly presented to the trial court, its refusal to instruct on an "act of God" is fully supported by the record. Defendants' argument appears to be that fluctuations in the level of the water table in the area of the new houses was a result of an "act of God." The evidence concerning the water table simply was that it rose and fell from time to time. The evidence on the point consisted primarily of the testimony of M. S. Mitchell, Superintendent of the Wichita-Sedgwick County Flood Control Project. He testified that the water level was normally higher in the spring and early fall and lower in the winter and at times during the midsummer. He said his office maintained 15 test wells in and around Wichita to determine the level of ground water each week. Well No. 13 was located about a mile from the homesites. Mitchell testified that the correlation of this test well and the water table at the homesites area would be very similar. He further testified that if inquiry had been made in the summer of 1967 regarding the level of the water table at test well No. 13 he would have advised anyone inquiring of the drainage problem in the area. Testimony that there may have been fluctuations or a gradual increase in the level of the water table is not sufficient evidence to support an "act of God" defense.

An "act of God" to be a defense must be an intervening cause which was not foreseeable and consequences of which could not be prevented. (*Lee v. Mobil Oil Corporation*, 203 Kan. 72, 452 P. 2d 857.) An "act of God", as known in the law, is an irresistible superhuman cause, such as no reasonable human foresight, prudence, diligence and care can anticipate and prevent. (*Huebert v. Federal Pacific Electric Co.*, Inc., 208 Kan. 720, 494 P. 2d 1210; *Lee v. Mobil Oil Corporation*, supra; and *Garrett v. Beers*, 97 Kan. 255, 155 Pac. 2.)

In their fifth specification of error defendants contend that as a matter of law the evidence fails to disclose that defendants breached the contracts or were guilty of negligence in the construction of plaintiffs' houses.

In their argument, defendants suggest that the rule of caveat emptor should apply, thus exempting them from liability in this case. It appears that defendants seek to apply the ancient rule of caveat emptor with respect to sales of real property to the instant case. Defendants direct our attention to an annotation appearing in 25 A. L. R. 3d p. 383 dealing with the subject of the liability of a builder-vendor for damages occasioned by defective conditions. We have examined the cases discussed in the annotation referred to and find that the overwhelming majority of modern cases do not sustain defendants' position. The author of the annotation makes this observation:

"It has been noted that while most courts still adhere to the proposition that in the usual, normal sale of lands and old buildings the ancient doctrine of caveat emptor applies, the decided trend of modern decisions is to make a distinction with respect to a vendor who is also the builder of a new structure, and that where the vendor is also the builder, he is today, by the weight of modern authority, held liable for damages and injuries occurring after the surrender of title and possession, on one or more of three theories: (1) implied warranty; (2) an imminently dangerous condition caused by negligence in construction; and (3) concealing or failing to disclose to his vendee any condition which involves unreasonable risk to persons on the land if the vendee does not know or have reason to know the condition of the risk involved and the vendor knows or has reason to know of the condition. . . ." (p. 391.)

The rationale of the cases is summarized in this fashion:

"Similarly, it has been said that the trend of recent judicial decisions is to invoke the doctrine of implied warranty of fitness in cases involving sale of new houses by the builder; that the old rule of caveat emptor does not satisfy the demands of justice in such cases; that the purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime; and that to apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice.

"When a vendee buys a development house from an advertised model, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in a reasonably workmanlike manner and will be reasonably fit for habitation, and since he has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder-vendor is negligible." (pp. 391, 392.)

The case at bar was submitted to the jury on the theories of negligence and breach of contract. There was ample evidence to support liability on either or both theories. The testimony of superintendent Mitchell, previously referred to, and that of Charles McAfee, an architect familiar with home construction in the area, is sufficient to support the jury's verdict on the theory of negligence. McAfee testified that drainage problems have continuously existed in the area; that a reasonably prudent contractor would not commence construction in the area without first attempting to determine the level of the water table; that there were several ways it could be checked—(1) by securing a test by an independent testing laboratory and (2) by digging a hole several feet below the bottom of the basement and observing the hole for a period of time.

In his deposition, which was read to the jury, defendant M. W. Renollet said:

" 'There were not any tests made to determine the depth of the water. . . . I was the first one to build houses with basements in this block. Knowing today that the water table comes up too high. I would not put basements in these houses unless I could raise the house a couple or three feet higher.' "

The evidence that M. W. Renollet failed to make the tests that a reasonably prudent contractor would have made under the circumstances is ample to support the jury's verdict with respect to the negligence of both defendants.

With respect to breach of contract, the pretrial conference order discloses that the parties stipulated that none of plaintiffs' houses were constructed with lateral drainage lines. The purchase contracts provided that McFeeters' house was to be built under plans and specifications approved by VA, the other three houses under FHA plans. The VA and FHA had identical minimum construction requirements for foundation drains (lateral lines). Before commencing construction, defendant Renollet submitted plans to FHA and VA, respectively.

With regard to footing drains in the FHA plans there is some dispute in the evidence. Lloyd Montgomery, Chief Architect for the Kansas Office of FHA, testified that the fifth page of the plans indicated that footing drains were to be installed beneath the basement floor; that after the plans were submitted to FHA, an unidentified FHA processor had marked "not anticipated" on page five of the plans and drew a line to the portion of the plan re-

garding footing drains. Montgomery testified, however, that the notation "not anticipated" had later been scratched out and the comment written "this is in 2014 cost and should be required." Montgomery explained that this meant the drains were included in the FHA cost projection. Montgomery further explained that deletion of drains from the plans required a filing by the builder of an FHA form 2577 requesting an acceptance of changes from the approved plans and descriptions of materials. He further testified that he had reviewed each of the three subject files and was unable to locate any form 2577 executed on any of these homes.

Donald Southerland, construction analyst for VA, testified that VA had minimum construction standards that were identical to those of FHA. He further testified that the McFeeters' file disclosed that drain tile under the basement floor was called for by his house plans.

Since it was stipulated that none of the plaintiffs' homes were constructed with lateral lines, we believe the evidence referred to is sufficient to support a finding of breach of contract.

The judgment is affirmed.