No. 98,419

SCOTT DAVID and SHERRY DAVID, *Appellants*, v. DAVID HETT,
d/b/a HETT CONSTRUCTION, *Appellee.*

(270 P.3d 1102)

Opinion filed December 30, 2011.

*Randall E. Fisher*, of Law Office of Randall E. Fisher, of Wichita, argued the cause and was on the briefs for appellants.

*Patrick J. Murphy*, of Wallace, Saunders, Austin, Brown & Enochs Chartered, of Wichita, argued the cause and *Craig C. Blumreich*, of Larson & Blumreich, Chtd., of Topeka, was with him on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: This dispute questions whether the economic loss doctrine, which began as a prohibition against certain product liability

actions, extends to tort claims brought by homeowners against residential service contractors for poor workmanship. The district court and Court of Appeals applied the doctrine and dismissed the homeowners' negligence theories. But we hold the doctrine should not apply. Our existing caselaw establishes that homeowners' claims against residential contractors may be asserted in tort, contract, or both, depending on the nature of the duty giving rise to each claim. We also find that the rationales upholding the economic loss doctrine do not support its adoption for disputes between homeowners and their contractors. We reverse and remand to the district court to determine whether there is any alleged breach of a common-law or statutory duty that would independently form the basis for a negligence claim against the contractor. We are unable to resolve that question from the record now before us.

## Factual and Procedural Background

In 1998, Scott and Sherry David acted as their own general contractor in order to build a home in Tampa, Kansas. They intended to live in the house once it was completed and were not building it to sell to a third party. They performed some work themselves, such as framing, roofing, and finishing but hired contractors for other aspects of the endeavor.

The Davids had no prior experience acting as general contractors on a home construction project. At their request, they received a written bid from David Hett d/b/a/ Hett Construction for the excavation, basement, and concrete work called for in the plans and specifications supplied by the Davids. Scott orally accepted Hett's written bid, which is not part of the record on appeal.

It is uncontroverted that the parties orally agreed to modify the plans and specifications prior to Hett beginning work, although it is disputed whether the changes they agreed to included the dimensions for concrete footings and other foundation work beneath the structure. The Davids claim Hett represented that his concrete and foundation work would be performed as described in the original plans, specifications, and drawings. Hett counters that he advised the Davids that he had never before installed the 30-inch

deep footings on a residential basement as shown on the plans and would instead pour a 12-inch footing, as he had always done. It is uncontroverted that the Davids accepted Hett's completed work in 1998 and paid him approximately $20,000—although they claim they never inspected what Hett did.

In 2003, the Davids began experiencing unusual settling in their home's garage and basement areas. In 2005, they sued Hett for breach of contract, negligence, fraud, fraudulent concealment, and violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq*. They claimed Hett negligently failed to perform the contractually required work by not installing the footings according to the building plans; used wet and loose fill material; did not encase the drain tile in gravel, which caused it not to function properly; and caused a significant void under the porch that extended along a portion of the driveway slab, the full length of the garage floor, and beyond the back of the house. The lawsuit sought actual damages "in order to bring the house into compliance with the plans, specifications and drawings that were originally agreed upon between the plaintiffs and defendant as the proper construction for [the] house." The Davids also demanded attorney fees and costs.

When discovery closed in the district court proceedings, Hett moved for summary judgment and the Davids failed to timely file the required statement indicating whether each factual contention set out in Hett's motion was controverted. See Supreme Court Rule 141(b) (2010 Kan. Ct. R. Annot. 228). As a consequence, the district court properly treated Hett's statement of uncontroverted facts as admissions by the Davids when addressing Hett's motion. See *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 604, 738 P.2d 1246 (1987) (opposing party admits the uncontroverted facts set forth in the movant's statements by failing to comply with the rule). These admissions effectively devastated many of the Davids' claims. As the Court of Appeals observed, "Persons who fail to comply with Supreme Court Rule 141 do so at their peril." *David v. Hett*, No. 98,419, 2008 WL 4849147, at *2 (Kan. App. 2008) (unpublished opinion).

In its straightforward and well-reasoned decision, the district court granted summary judgment in Hett's favor on all claims. The

court found the contract allegations and action under the Kansas Consumer Protection Act were barred by the statute of limitations. The court also held that the uncontroverted facts demonstrated Hett made no untrue statements nor took any action with intent to deceive the Davids, which were essential elements to plaintiffs' fraud counts, so those claims failed as well.

As to the negligence allegations of interest in this appeal, the district court held that the economic loss doctrine prevented the Davids from bringing a tort action under circumstances governed by contract. As to this holding, the district court adhered to the Court of Appeals' decision in *Prendiville v. Contemporary Homes, Inc.*, 32 Kan. App. 2d 435, 83 P.3d 1257, *rev. denied* 278 Kan. 847 (2004). The district court also held that the economic loss doctrine supplied an additional bar to plaintiffs' fraud claims. The Davids timely appealed. The Court of Appeals affirmed the district court's decision in all respects. *David*, 2008 WL 4849147.

Plaintiffs sought review from this court on each adverse determination. But we accepted the appeal only to decide whether the economic loss doctrine barred any negligence claims. Our jurisdiction arises under K.S.A. 20-3018(b) (review of a Court of Appeals' decision). This court has never before considered the economic loss doctrine in any context, including product liability actions where the doctrine originated.

## Standard of Review

Appellate review of an order granting summary judgment is unlimited when there is no factual dispute. *Polson v. Farmers Ins. Co.*, 288 Kan. 165, Syl. ¶ 1, 200 P.3d 1266 (2009). In addition, determining whether the economic loss doctrine applies in a case is an issue of law subject to unlimited appellate review. *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 201, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998); *Insurance Co. of North America v. Cease Electric, Inc.*, 276 Wis. 2d 361, 369, 688 N.W.2d 462 ( 2004) ("[The economic loss doctrine's] application to a set of facts also presents a question of law subject to independent appellate review."); see also *Wilkinson v. Shoney's, Inc.*, 269 Kan.

194, 203, 4 P.3d 1149 (2000) (whether to recognize a new common law cause of action is a question of law subject to unlimited review).

## ANALYSIS

The economic loss doctrine is a creation of modern product liability law. *Sapp. v. Ford Motor Co.*, 386 S.C. 143, 147, 687 S.E.2d 47 (2009). It is described generally as "a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Indemnity Ins. Co. v. American Aviation*, 891 So. 2d 532, 536 (Fla. 2004).

Much is written in the nation's caselaw, scholarly journals, and other secondary sources about the economic loss doctrine. Its wide-ranging impact and the frequent challenges to its boundaries have caused several commentators to note the "vast confusion over this area of the law." See Note, *Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud*, 84 Wash. U. L. Rev. 1513, 1513 (2006). In one sense, the "economic loss doctrine" or "economic loss rule" is a well-recognized tort concept, but a review of the caselaw across various jurisdictions shows it has proven difficult to define because there are a number of permutations. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 524 (Spring 2009).

In light of this, and because the economic loss doctrine is an issue of first impression for this court, our holding is best explained if we discuss the subject matter in the following progression: (1) A brief discussion about product liability law and the doctrine's origins and applications in other jurisdictions; (2) the doctrine's development to date in Kansas; (3) the causes of action historically recognized in Kansas home construction litigation; (4) an explanation as to why the economic loss doctrine should not apply in residential construction cases; and (5) the appropriate disposition for this appeal under the circumstances presented.

*Product liability law and the economic loss doctrine*

Product liability law resulted from a policy determination that the public needed greater protection from dangerous products

than was typically provided by contract-based warranty law. *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 866, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986). Initially, courts imposed liability by adopting an implied warranty of safety, which abandoned what had been a long-standing requirement for direct contractual privity with the injured party. See *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960); Prosser and Keeton, Law of Torts § 97, at 690 (5th ed. 1984).

In Kansas, product liability law matured much the same way as it did in other jurisdictions. This court initially adopted an implied warranty of fitness theory for personal injuries resulting from food and body preparation products. We found liability did not need to arise from the parties' contract, but instead should be imposed by operation of law when the food or body product at issue was dangerous and defective and resulted in physical injury. *Swengel v. F. & E. Wholesale Grocery Co.*, 147 Kan. 555, 561, 77 P.2d 930 (1938) (iron poisoning from sauerkraut juice); see also *Graham v. Bottenfield's, Inc.*, 176 Kan. 68, 74, 269 P.2d 413 (1954) (injuries caused by a hair preparation product); and *Nichols v. Nold*, 174 Kan. 613, 630, 258 P.2d 317 (1953) (injuries when carbonated beverage bottle exploded). In time, this implied warranty of fitness concept extended to manufacturers and sellers of other defective products. See, *e.g.*, *Tilley v. International Harvester Co.*, 208 Kan. 75, 82, 490 P.2d 392 (1971) (broken wheel); *Bereman v. Burdolski*, 204 Kan. 162, 165, 460 P.2d 567 (1969) (defective brakes); *Evangelist v. Bellern Research Corporation*, 199 Kan. 638, 642, 433 P.2d 380 (1967) (bottle recapping device); *Jacobson v. Ford Motor Co.*, 199 Kan. 64, 67, 427 P.2d 621 (1967) (defective brakes).

But implied warranty theories proved difficult for courts in all jurisdictions to apply in the product liability context because the implied warranty was premised on contract principles, even though the parties did not have a contract. This anomaly was addressed in the seminal case of *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963). In that decision, the California Supreme Court took note that judicial abandonment of any requirement for a contract to exist between the parties when a dangerous and defective product caused personal injury was in

reality simply imposing strict liability in tort based upon the dangerousness of the product. 59 Cal. 2d at 63. This recognition was ultimately integrated into section 402A of the Restatement (Second) of Torts.

In 1976, this court followed the trend arising after the California Supreme Court's *Yuba Power* opinion and transitioned from the implied warranty of fitness theory to the strict liability rule set out in section 402A of the Restatement (Second) of Torts. *Brooks v. Dietz*, 218 Kan. 698, 702, 545 P.2d 1104 (1976) ("We have concluded the time has come for this court to adopt the rule of strict liability as set out in [the Restatement].") A few years later, we applied section 402A to permit recovery for damage to property other than the defective product. *Kennedy v. City of Sawyer*, 228 Kan. 439, 445-46, 618 P.2d 788 (1980) (bystander or third party may recover economic loss to property to promote the public interest in discouraging the marketing of defective products that are a menace to the public). Today, the Kansas Product Liability Act, K.S.A. 60-3301 *et seq.*, consolidates all product liability actions, regardless of theory, into one basis for liability. *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 756, 861 P.2d 1299 (1993).

But as courts expanded tort law to product liability cases, the concern arose that tort law would consume contract law. *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1259-60 (Colo. 2000). Once again, the California Supreme Court was the first to address the question by adopting the economic loss rule to limit the use of tort law in products cases. *Seely v. White Motor Co.*, 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965). In that case, the plaintiff sued after a commercial truck overturned when its brakes failed. There were no physical injuries, but the plaintiff sued for monetary damages to repair the truck, recover the purchase price, and recoup lost profits. The *Seely* court rejected these tort claims. As a result, the plaintiff was barred from bringing an action when the only damages alleged were economic loss, even though the plaintiff could have recovered in tort if there were bodily injuries. The *Seely* court justified this differing treatment by stating:

"The distinction rests . . . on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately

be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety in terms of conditions that create unreasonable risks of harm. He cannot be held liable for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. *A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.* Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." (Emphasis added.) 63 Cal. 2d at 18.

After *Seely*, the economic loss doctrine spread through various jurisdictions and was often viewed simply as a means of preserving distinctions between tort law and contract law. In 1986, the United States Supreme Court adopted a version of the doctrine in a product liability lawsuit arising from that Court's admiralty jurisdiction. See *East River*, 476 U.S. at 875. We detail that case because it later served as a basis for the doctrine's development in Kansas by our Court of Appeals.

In *East River*, Seatrain Shipbuilding Corp. contracted with Transamerica Delaval, Inc. to design, manufacture, and supervise installation of four turbines on four oil-transporting supertankers. After completion, Shipbuilding transferred title to another entity, which in turn chartered the ships to others. After three supertankers were in use, a turbine malfunctioned on one but damaged only the turbine. Two other supertankers were inspected and similar damage discovered, requiring repair and replacement parts. The fourth ship was completed after the problem was discovered, and it did not experience the same issue; but its turbine was damaged because a part was incorrectly installed, requiring different repairs.

Shipbuilding and the charterers initially sued in breach of contract, warranty, and tort, but the statute of limitations barred the contract and warranty claims. Shipbuilding dropped its lawsuit, but the charterers amended their complaint to allege five tort claims. The first four asserted that Delaval was strictly liable for design defects that damaged the turbines on three ships. The fifth claim alleged Delaval negligently supervised installation of the part that was incorrectly installed on the fourth vessel. The charterers sought

damages for the cost incurred to repair the supertankers and their lost income.

In deciding the case, the Supreme Court summarized the question presented as "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." 476 U.S. at 866. In other words: Should a common-law duty be imposed on Delaval or should liability arise only from the contract?

The *East River* Court began its analysis by recognizing how product liability emerged as a public policy determination that people needed protection from dangerous products, and how that recognition led to the imposition of strict liability for dangerous products and a broader duty on manufacturers if there was damage to other property. The *East River* Court then famously cautioned that if this expanding product liability law "were allowed to progress too far, contract law would drown in a sea of tort." 476 U.S. at 866. To temper the trend, the Court found it was appropriate to bar actions in tort for negligence or strict liability when a product malfunctions and causes only economic loss in the form of damage to the product itself. 476 U.S. at 876. Importantly, the Court provided three justifications.

The first drew upon the earlier recognized policy rationale for imposing strict liability for a dangerous product. The Court found the concern for individual safety was reduced when the only damage was to the product because the cost arising from that damage was significantly less than personal injury and much easier to anticipate. It also noted that economic damages to a commercial user when a product injures itself were limited to the product's lost value, customer displeasure, and increased costs of performance. These economic losses, the Court found, were easily insured and the societal cost for holding a manufacturer liable in tort unjustified. 476 U.S. at 871-72.

Second, the *East River* Court held that contract and warranty law were better suited for commercial controversies when the only damage was to the product because the claim at issue was more naturally viewed as a contract claim arising when the product failed to meet a customer's expectations. It also found contract law was

the better fit because it allowed parties to allocate their respective risks by agreement. In other words, the manufacturer could limit its liability by disclaiming warranties and the purchaser, in turn, could negotiate a lower price. This analysis hinged, however, on the Court's recognition that "a commercial situation generally does not involve large disparities in bargaining power." 476 U.S. at 873.

Third, the *East River* Court held that permitting the imposition of tort liability for the economic losses suffered by parties not in privity with the manufacturer, such as the charterers and subcharterers, would sanction indefinite damages beyond the confines of the commercial contract, and the Court concluded that the law does not stretch that far. 476 U.S. at 873-74. Therefore, the *East River* Court held the economic loss doctrine should apply and barred plaintiffs' tort claims.

It was the appealingly simple rationale for preserving distinctions between tort and contract law, as described in *East River*, that convinced some jurisdictions to stretch the doctrine beyond commercial product liability litigation to others cases, such as those involving contracts for the performance of services. See, *e.g.*, *Fireman's Fund Ins. v. SEC Donohue*, 176 Ill. 2d 160, 167, 679 N.E.2d 1197 (1997) (doctrine bars recovery in tort against engineers for purely economic losses); *Boston Inv. Property # 1 State v. E.W. Burman*, 658 A.2d 515, 518 (R.I. 1995) (subsequent purchaser of commercial office building not entitled to recover economic damages allegedly caused by general contractor negligence); *Berschauer/Phillips v. Seattle Sch. Dist.*, 124 Wash. 2d 816, 818, 881 P.2d 986 (1994) (recovery of economic loss due to construction delays limited to remedies stated in contract).

Generally speaking, courts applying the doctrine's bar to cases involving any contract between the parties reasoned that the contract should adequately address the parties' risks, and tort exposure should be limited to hold the parties to the terms of their agreement. *Town of Alma*, 10 P.3d at 1262 (describing the reasoning for the doctrine's extension as "[l]imiting tort liability when a contract exists between parties is appropriate because a product's potential nonperformance can be adequately addressed by rational eco-

nomic actors bargaining at arm's length to shape the terms of the contract").

But other jurisdictions rejected this broad application. In those instances, the courts noted the Uniform Commercial Code provided additional protections in commercial settings that were not available in contracts arising in noncommercial circumstances, so the doctrine's operational bar was limited to commercial situations. *Insurance Co. of North America v. Cease Electric Inc.*, 276 Wis. 2d 361, 376-77, 688 N.W.2d 462 (2004) ("Unlike contracts for products or goods, which enjoy the benefit of well-developed law under the U.C.C., no such benefit exists for contracts for services. This is because the U.C.C. does not apply to service contracts."); see also *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995) (doctrine not applicable to transactions in services); *McCarthy Well Co., v. St. Peter Creamery*, 410 N.W.2d 312, 315 (Minn. 1987) (when the U.C.C. does not apply, there is no reason for the economic loss doctrine to apply).

More recently, the economic loss doctrine has undergone another transformation as some jurisdictions have begun limiting its reach by adopting an "independent duty rule," which appears to recognize a view that the pendulum has again swung too far. See *Town of Alma*, 10 P.3d at 1262; *Eastwood v. Horse Harbor Found.*, 170 Wash. 2d 380, 387, 241 P.3d 1256 (2010) ("The term 'economic loss rule' has proved to be a misnomer."); *Affiliated FM Ins. v. LTK Consulting*, 170 Wash. 2d 442, 449, 243 P.3d 521 (2010).

For example, when the Colorado Supreme Court addressed the economic loss doctrine's propriety for the first time in *Town of Alma*, 10 P.3d 1256, it expressly adopted the doctrine by name, but it redefined its principles to such a degree that it effectively created a new doctrine. The court began by acknowledging the caselaw that found the doctrine properly maintains a distinction between contract and tort law. But it noted the fundamental difference between an obligation founded in tort and one in contract arises from the source of the duty. The court then held that "the key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action." 10 P.3d at 1262. It observed also that a " 'more accurate

designation of what is commonly termed 'the economic loss rule' would be an 'independent duty rule.' " 10 P.3d at 1262 n.8. And based on this perspective, the court concluded that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care under tort law.*" (Emphasis added.) 10 P.3d at 1264.

The *Town of Alma* court's approach does not provide an absolute bar to tort claims. Instead, it focuses the analysis on what the court defined as the primary distinction between contract and tort law, and its holding that "the key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action." 10 P.3d at 1262. This departs from the traditional damage-based analysis some other jurisdictions employ by concluding that the "type of damages suffered and the availability of a tort action is inexact at best." 10 P.3d at 1263. But, the court continued, the type of damages being claimed may help decide whether the source of the duty allegedly breached arises in tort or contract law. 10 P.3d at 1263.

The Washington Supreme Court recently adopted a similar duty-based analysis in *Eastwood.* In that case, the court held that when faced with distinguishing between when a plaintiff is limited to contract remedies and when recovery in tort may be available "[a] review of our cases on the economic loss rule shows that ordinary tort principles have always resolved this question." 170 Wash. 2d at 389. A plaintiff's injury, the court found, is remediable in tort—if the injury can be traced back to a tort duty arising independently from the contract. See also *Affiliated FM Ins.,* 170 Wash. 2d at 449 (when determining whether a plaintiff is limited to contract remedies Washington courts follow the independent duty doctrine and " 'an injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract' ").

Notably, this independent duty analysis mirrors the rationale used by this court over several years to distinguish between causes of action arising in tort from those in contract in various types of litigation, including home construction. See *Tamarac Dev. Co. v.*

*Delamater, Freund & Assocs.*, 234 Kan. 618, 619-20, 675 P.2d 361 (1984). But we first emphasized the importance of this duty-based analysis in *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885 (1976), which was a medical malpractice case. The issue was whether the claims arose in contract or tort. The court held the answer turned on whether "the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties." 220 Kan. at 374. In so holding, this court underscored the distinction between contract and tort because a breach of contract claim is a material failure to perform a duty arising under or imposed by agreement, while a tort is a violation of a duty imposed by law. 220 Kan. at 374. The court noted the legal duty imposed on physicians and hospitals was the duty to use reasonable and ordinary care and diligence in the treatment of the patient. 220 Kan. at 375. This court then adopted the following test, which it derived from a decision by the Washington Supreme Court:

" 'When an act complained of is a breach of specific terms of the contract, without any reference to the legal duties imposed by law upon the relationship created thereby, the action is in contract, *but where there is a contract for services which places the parties in such a relation to each other that, in attempting to perform the promised service, a duty imposed by law as a result of the contractual relationship between the parties is violated through an act which incidentally prevents the performance of the contract, then the gravamen of the action is a breach of the legal duty, and not of the contract itself.*' " (Emphasis added.) 220 Kan. at 375-76.

*Malone* has been followed in subsequent cases when this court was faced with determining whether a cause of action arises in tort or contract. See, *e.g.*, *Tamarac*, 234 Kan. at 619-20 (breach of contract is a failure to perform a duty arising by agreement and a tort is a violation of a duty imposed by law); *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 85, 716 P.2d 575 (1986) (same); *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 113, 936 P.2d 714 (1997) (same).

In summary, and as this overview of the economic loss doctrine's function illustrates, the doctrine is viewed differently in various

jurisdictions. Some apply it more restrictedly to commercial settings, while others extend it more broadly as an effort to preserve distinctions between contract law and torts. More recently, some have limited the doctrine's reach when an independent duty can serve as the basis for a tort claim. We consider next how the economic loss doctrine has been viewed to date in this state.

*The economic loss doctrine's development in Kansas*

The first court in Kansas to consider the doctrine's application was the United States District Court for the District of Kansas. And although it predates *East River*, this first case is noteworthy because it recognized the many conflicting policy considerations at issue. The case dealt with an attempt to recover for injury to business reputation from use of an allegedly defective roofing product and the cost of repairing the roofs to which the product was applied. *Woodard v. Republic Powdered Metals, Inc.*, No. 74-127-C5 (D. Kan. Sept. 22, 1977) (unpublished opinion).

In denying the claim, the federal court articulated four justifications to bar the negligence action under these facts: (1) no unreasonably dangerous conduct would be deterred by permitting a negligence action for such damages; (2) such an action would interfere with the manufacturer's freedom to contractually limit consequential damages under the Uniform Commercial Code, which "would severely confuse the already knotty problem of insurability in the products liability area," *Woodard*, No. 74-127-C5, slip op. at 7; (3) the risk of consequential economic loss is closely related to the plaintiff's business and could be more easily passed on than the risk of personal injury; and (4) Kansas law did not permit concepts of privity or disclaimers of warranties to operate against the plaintiff in a consumer transaction when unequal bargaining power may be present. The court then concluded: "In summary, many factors militate against allowing a negligence action to recover consequential losses in products liability suits, not the least of which is the availability of a satisfactory remedy under the Uniform Commercial Code." *Woodard*, No. 74-127-C5, slip op. at 8. After *Woodard*, federal courts in this state adopted differing views as to these factors in the absence of direction from state appellate courts. See

*Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F. Supp. 118, 126 (1982) ("We doubt that the Kansas appellate courts would engage in drawing lines between different types of property damage as attempted [by courts referenced from other states].").

Our Court of Appeals adopted the economic loss doctrine first in a commercial product liability setting. *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998). In *Koss,* a construction company sued the manufacturer in strict liability and negligence for damage to a Caterpillar vibratory roller allegedly caused by a defective hydraulic hose. Caterpillar sought summary judgment on the strict liability and negligence claims, arguing Koss could not recover in tort for pure economic loss.

Presented as an issue of first impression, the Court of Appeals held "[u]nder Kansas law, the economic loss doctrine applies to a claim for damage to a product itself." 25 Kan. App. 2d at 207. To reach its conclusion, the *Koss* court said it found the then-recent United States Supreme Court approach in *East River* persuasive because it "provides a rule that is straightforward and predictable and that establishes a logical demarcation between cases properly pursued as tort actions and those which are warranty claims." 25 Kan. App. 2d at 205. The court also found convincing the fact that a growing number of jurisdictions since *East River* had embraced its reasoning and that the approach was adopted in the Restatement (Third) of Torts: Product Liability § 21(c) (1998). 25 Kan. App. 2d at 204-05.

In the next case it considered on the subject, the Court of Appeals expanded the economic loss doctrine to include defective products purchased in consumer transactions. *Jordan v. Case Corp.*, 26 Kan. App. 2d 742, 993 P.2d 650 (1999), *rev. denied* 269 Kan. 933 (2000). In *Jordan,* the plaintiff bought a Case combine with a Cummins engine. The engine allegedly caused a fire, destroying the combine, engine, and the plaintiff's unharvested wheat. The district court granted summary judgment citing *Koss,* and the Court of Appeals affirmed. 26 Kan. App. 2d at 743. One issue was whether the doctrine should be limited to commercial buyers, and the court held that the doctrine's general rationale

applied equally in consumer transactions and should extend to non-commercial buyers. 26 Kan. App. 2d at 744. To reach this conclusion, however, the panel's analysis necessarily downplayed *East River's* rationale that a supporting principle for the doctrine was recognition that commercial buyers may undertake sophisticated contract negotiations with the seller and be more equal in bargaining power. See 476 U.S. at 872-73. The *Jordan* court dismissed these concerns because the plaintiff in the case had engaged in his own contract negotiations in purchasing the combine and had insurance. 26 Kan. App. 2d at 744.

The Court of Appeals specifically addressed the issue in the residential construction context now before this court in *Prendiville v. Contemporary Homes, Inc.*, 32 Kan. App. 2d 435, 83 P.3d 1257, *rev. denied* 278 Kan. 847 (2004). In that case, the homeowner contracted with the defendants to build a house. When the plaintiff took possession, he signed a 1-year new home warranty, containing an express provision disclaiming all warranties and representations not stated in the warranty. More than 4 years later, plaintiff noticed water infiltration through the stucco siding and sued the contractor and the siding company for breach of warranty, negligent construction of the house, and violations of the Kansas Consumer Protection Act. The plaintiff alleged damages for the window's replacement costs and installation, interior painting, a complete skim of the exterior, and repainting and caulking. Plaintiff claimed the contractor negligently violated the contract and a duty imposed by law, stating:

" '[The contractor] fail[ed] to employ the degree of professional skill, diligence, knowledge and attention to detail that [the plaintiff] had reason to expect from a reputable home builder charged with the duty to provide building services in a workmanlike manner, and said defendants negligently failed to:
    a. Properly select and supervise the workmen on the work site;
    b. Properly install or supervise the installation of the Dryvit exterior stucco; and
    c. Properly construct a home in accordance with those duties and standards placed upon said defendants by Uniform Building Code practices.' " 32 Kan. App. 2d at 437.

The district court dismissed these negligence claims, finding them barred by the economic loss doctrine. In reviewing that de-

cision, the Court of Appeals broadly defined the issue as "whether the economic loss doctrine applies to a claim against a contractor in residential construction defect cases." 32 Kan. App. 2d at 438. It described the doctrine in general terms as restricting any buyer of defective goods from suing in tort when the injury consists only of damage to the goods themselves, citing *East River*; and it then held the doctrine's application to residential home construction did not conflict with the policy considerations underlying the doctrine's initial adoption. 32 Kan. App. 2d at 439. Finally, the court concluded that an extension to residential construction services was the next logical step in the doctrine's progression, explaining:

" '[W]e find no compelling reason why the economic loss doctrine should not be applied to a claim against a contractor in residential construction defect cases. Whether or not a house is deemed to be a 'product,' *we find that the principles underlying the economic loss doctrine apply to a residential construction transaction where the rights and liabilities of the parties are governed by contract and express warranty.* This does not bar all of [plaintiff's] claims against the defendants, but only those claims based on tort. If an exception to the economic loss doctrine is to be made for homeowners, it should be up to the state legislature.' " (Emphasis added.) 32 Kan. App. 2d at 445.

Interestingly, the *Prendiville* court did not explain how the legislature's inaction should be determinative since the economic loss doctrine was judicially created and our legislature had not adopted or disclaimed it in any context. We also fail to see how those factors enter into a court's consideration in a context such as this. More importantly, *Prendiville* does not square with our long-standing caselaw recognizing that homeowners may sue a construction contractor in tort, contract, or both, depending on the nature of the duty giving rise to the claim. See, *e.g.*, *McFeeters v. Renollet*, 210 Kan. 158, 163-64, 500 P.2d 47 (1972). Instead, the *Prendiville* court simply dismissed our court's previous residential construction cases as having "limited precedential value." *Prendiville*, 32 Kan. App. 2d at 442. We discuss those cases next and conclude that *Prendiville* missed the mark set by them.

*Causes of action historically recognized in Kansas residential construction*

The first Kansas case addressing what causes of action were available to homeowners against their contractors for poor workmanship was *Crabb v. Swindler, Administratrix*, 184 Kan. 501, 337 P.2d 986 (1959). In that case, the homeowners alleged their plumber negligently installed fixtures in an unworkmanlike manner and contrary to recognized plumbing practices, which caused flooding. The only monetary loss claim was depreciation to the home's market value. But the plumber had died before the defects were discovered, so the district court dismissed the homeowners' lawsuit, finding that tort claims could not survive the plumber's death because of statutory restrictions. 184 Kan. at 503-04. The homeowners appealed, arguing their claim accrued during the plumber's lifetime because it sounded in contract for the breach of an implied warranty. 184 Kan. at 504.

The *Crabb* court's analysis focused on whether an implied warranty attached to the original agreement to provide plumbing services. The court held that a contract to do work or perform a service includes an implied warranty that the work will be done in a workmanlike manner, using appropriate care and skill, unless there is an express agreement that no such warranty may be implied. 184 Kan. at 505. The court said the duty to provide services in a workmanlike manner "annexes to the contract," so that a breach of implied warranty claim stated a cause of action in contract. 184 Kan. 501, Syl. ¶ 2. But in so holding, the *Crabb* court also recognized that a negligence claim could have arisen in this context. The court noted:

"A breach of an implied warranty to use reasonable and appropriate care and skill, that is, to do a workmanlike job, usually results from the negligence or failure to use due care and skill in performing the particular work. [Citation omitted.] Hence, the tortious or negligent acts alleged may be considered as allegations of the breach of implied warranty. [Citation omitted.]" 184 Kan. at 505.

But in arriving at its result the court also recognized prior caselaw that held the distinction between a tort and contract claim "is not always easy to determine" from the pleadings because

" 'contracts are often alleged in actions which clearly sound in tort, and as often tortuous acts and conduct of the defendant are averred in actions purely *ex contractu.* And often the plaintiff has his election upon the same state of facts, whether to bring an action *ex contractu,* or one *ex delicto.*' " 184 Kan. at 505-06 (quoting *K.P. Rly., Co. v. Kunkel,* 17 Kan. 145 [1876]).

Several years later, the *Crabb* decision served as a basis for this court to articulate for the first time a common-law duty imposed on service contractors in *Gilley v. Farmer,* 207 Kan. 536, 485 P.2d 1284 (1971). In that case, the plaintiffs sued their insurance provider for negligence and bad faith in handling a claim. The insurer argued that the requested remedy (garnishment) was not an available remedy because the plaintiffs' claims arose in tort, not contract. But citing *Crabb,* this court held:

"[W]here a person contracts to perform work or to render a service, without express warranty, the law will imply an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in doing the work. [Citation omitted.]

"Where negligence on the part of the contractor results in a breach of the implied warranty, the breach may be tortious in origin, but it also gives rise to a cause of action *ex contractu. An action in tort may likewise be available to the contractee and he may proceed against the contractor either in tort or in contract; or he may proceed on both theories.* [Citation omitted.]" (Emphasis added.) 207 Kan. at 542.

*Gilley* has been cited since and followed in subsequent home construction litigation as an accurate recitation of the duty recognized in *Crabb.* See *McFeeters,* 210 Kan. at 163; *Tamarac,* 234 Kan at 622.

In *McFeeters,* four homeowners sued the homebuilder for defective construction of their basements after discovering normal rainfall levels caused water to leak into the home, damaging the floors and walls. The homebuilder argued plaintiffs were required to elect between their theories of contract, warranty, and tort. Citing *Gilley,* this court reiterated that a person contracting to perform a service has a duty to do the job in a workmanlike manner and exercise reasonable care when doing the work. The *McFeeters* court said the homebuilder's duty " 'may be tortious in origin,' " but it " 'also gives rise' " to a contract claim for breach of implied warranty. 210 Kan. at 163-64. Therefore, the court continued, the

homeowner may proceed in tort or contract, or both. 210 Kan. at 163-64. This recognition of dual claims in tort and contract when a home construction contract is negligently performed was also later recognized by the Court of Appeals. See *Ware v. Christenberry*, 7 Kan. App. 2d 1, 5, 637 P.2d 452 (1981) ("[I]n Kansas a person suffering damage from breach of an implied warranty may proceed upon either a contract or tort theory, or both.").

In *Tamarac*, a residential developer sued an architectural and engineering firm after drainage problems occurred, based on an alleged breach of an oral contract to supervise the subcontractor responsible for grading. Since the developer's tort claim was barred by the statute of limitations, the issue was not whether the plaintiff stated a cause of action in tort, but this court implied that a timely filed claim would have survived in tort by again reciting that "an action against a general building contractor for improper construction of a home . . . could be either in tort or contract or both." 234 Kan. at 621. And on the more difficult question whether an implied warranty attached to the architect's or engineer's contract, the *Tamarac* court held a contract claim existed. 234 Kan. at 622.

But these residential construction cases did not make a significant impression on the Court of Appeals when it applied the economic loss doctrine's bar in *Prendiville*. Instead, it held that *Tamarac*, *Crabb*, and *Ware* were distinguishable because *Prendiville* dealt with an express warranty, while those other cases dealt with implied warranties. 32 Kan. App. 2d. at 442. But this is a distinction without a difference when determining whether the doctrine should prohibit a homeowner's claims against residential contractors because this court already had recognized that causes of action in these cases could sound in tort, contract, or both, depending on the nature of the duty giving rise to the claim. For that reason, the *Prendiville* court's failure to consider the nature of the duty owed diverted its attention from the appropriate factors.

Accordingly, we must determine whether the judicially stated policies underlying the economic loss doctrine justify overruling the prior precedent that had recognized that a homeowner's tort claim may coexist with contract claims under appropriate circum-

stances. We consider that question next and determine that *Prendiville* should be overruled.

## *The doctrine should not bar a homeowner's tort claims*

The *East River* Court held that contract and warranty law are better suited for claims when the only damage is to the product itself because: (1) those losses are easily insured; (2) restricting the parties to the contractual remedies allows the parties to allocate the risk through the bargaining process; and (3) warranty damages are sufficient to cover the injury. 476 U.S. at 871-74. We find these policy rationales do not readily apply to parties to a home construction contract and should not cause us to revise our existing caselaw.

First, service contracts lack the warranty protections afforded to goods under the Kansas Uniform Commercial Code for sales. The U.C.C. became law in 1966. L. 1965, ch. 564, § 18. It applies to transactions in goods, not services. See K.S.A. 84-2-102; 84-2-105. It contains provisions governing express and implied warranties. See K.S.A. 84-2-313 (express warranties); K.S.A. 84-2-314 (implied warranty of merchantability); K.S.A. 84-2-315 (implied warranty for fitness for a particular purpose). It also provides for modification of those warranties. K.S.A. 84-2-316.

But none of these statutory provisions apply to agreements between homeowners and contractors supplying services in the construction of the homeowners' residence. And as noted above, several jurisdictions have found the economic loss doctrine is not well suited for contracts to supply services because they are not subject to the well-developed law under the U.C.C. See *Insurance Co. of North America v. Cease Electric, Inc.*, 276 Wis. 2d 361, 381, 688 N.W.2d 462 (2004) ("economic loss doctrine is inapplicable for the negligent provision of services"); *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995) (doctrine applies to transaction in goods, not services); *McCarthy Well Co. v. St. Peter Creamery*, 410 N.W.2d 312, 315 (Minn. 1987) (The economic loss doctrine does not apply if the contract is not governed by the U.C.C.). The rationale of these cases is easily applied to residential construction contracts such as the one at issue in this case. In addition, we note the application of warranty law offers

very limited protection for homeowners because the nature of home defects, and the damages that arise from them, often are not discoverable until after a warranty period would expire.

Second, contracts governing residential construction rarely involve the sophisticated parties with equal bargaining positions present in commercial products cases. *Kennedy v. Columbia Lumber & Mfg. Co., Inc.*, 299 S.C. 335, 343, 384 S.E.2d 730 (1989) ("a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller"); see also Comment, *Constructing a Solution to California's Construction Defect Problem*, 30 McGeorge L. Rev. 299, 305 (1999) (describing how the practice of mass-producing homes after World War II resulted in "unequal bargaining power between buyer and seller"). The doctrine's application in this context would unequally benefit the contractor.

Finally, we agree with the analysis in *Kennedy* in which the South Carolina Supreme Court found the economic loss doctrine's application to home construction troubling because it focused on the consequence or damages, rather than the duty breached. In *Kennedy*, the court detailed a hypothetical involving two contractors who were equally blameworthy in building shoddy housing. But under a broader application of the economic loss doctrine, one contractor could be lucky enough to escape liability because the negligence was discovered before someone was harmed, limiting the damage to monetary loss, while the other may be liable in tort if a bodily injury occurred. 299 S.C. at 345 ("It hardly seems fair that Builder 'A' should profit from a diligent buyer's [pre-injury] discovery, or because he was fortunate.").

For these reasons, we reject the *Prendiville* court's determination that the same reasons justifying the economic loss doctrine's limitation in product liability lawsuits apply with equal force against a service contractor in the residential construction context. Therefore, we overrule the *Prendiville* court's extension of the doctrine to homeowners' claims against a residential contractor. The Court of Appeals erred in applying *Prendiville* to this case.

*The Disposition of this appeal*

But our decision to overrule *Prendiville* does not end the inquiry for the parties in this appeal. It must still be decided whether the gravamen of the Davids' claim arises in tort. See *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374, 552 P.2d 885 (1976). To do this, the pleadings must be examined to determine the nature of the duty alleged to have been breached in the Davids' claims—an analysis the lower courts did not undertake because they concluded any tort claims would be barred by the economic loss doctrine.

Whether a claim sounds in tort or contract is determined by the nature and substance of the facts alleged in the pleadings. *Nelson v. Nelson*, 288 Kan. 570, 582, 205 P.3d 715 (2009); *Malone*, 220 Kan. at 374. A breach of contract claim is the failure to perform a duty arising from a contract, and a tort claim is the violation of duty imposed by law, independent of the contract. 220 Kan. at 374. But the fact that the parties have a contractual relationship does not necessarily control the inquiry because legal duties may arise even though the parties also have a contract, so that " '[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of circumstances surrounding or attending the transaction, the breach of the duty is a tort.' " 220 Kan. at 375 (quoting *Yeager v. National Cooperative Refinery Ass'n*, 205 Kan. 504, 509, 470 P.2d 797 [1970]).

In their petition, the Davids allege Hett Construction "negligently performed the work agreed upon between plaintiffs and defendant by failing to perform the agreed upon excavation, basement and concrete work *according to the plans, specifications and drawings presented to him.*" (Emphasis added.) Likewise, the plaintiffs' contentions in the pretrial conference order focus on Hett's failure to complete the work *as required by the plans, specifications, and drawings* and allege substantial remedial work is required to bring the house "into compliance with the plans, specifications and drawings that were originally agreed upon between the plaintiffs and defendant as the proper construction for said house." These claims are consistent with the allegations in the Davids' appellate brief.

But notably, nowhere in the record before us do we find where the Davids specifically asserted any independent duty was imposed on Hett to perform his work in a particular manner. And as discussed above, this specification is a critical element upon which an alleged tort must be based—if a negligence claim is to survive in this case. The district court and the Court of Appeals did not address this because their application of *Prendiville* did not make that analysis necessary.

Based on the record before us, we are very tempted to find that the Davids did not allege viable negligence claims independent of the agreement with Hett, but we are reluctant to do so absent a specific finding from the district court on this pivotal question. Put simply, we cannot determine with appropriate certainty from the appellate record whether the Davids supported their negligence claims by citing to the district court any independent duty allegedly owed by Hett that was breached, aside from Hett's obligations under the agreement. We also hesitate to imply this finding simply because the district court applied the economic loss doctrine to the facts. And since the district court based its analysis entirely on *Prendiville*, which it was bound to respect under the circumstances, it had no need to delve further into the source of the negligence allegations. Finally, we note it is difficult for this court to follow what specific allegations are being articulated by plaintiff in the pleadings in light of some of the facts alleged, particularly since not all of the documentation regarding the agreement between the parties was included in the record on appeal.

Therefore, we remand the case to the district court to determine whether the Davids' claims arise in tort or contract. This inquiry must focus on the nature of the duty allegedly breached as articulated in *Malone* and its progeny. Obviously, if the district court finds the claims arise from the parties' contract, those claims are barred based upon the prior district court rulings that were affirmed by the Court of Appeals and constitute the law of the case. See *Venters v. Sellers*, 293 Kan. 87, 99, 261 P.3d 538, 547 (2011). If the district court determines some tort claims arise independently from the contractual duties between the parties, further proceedings will be required.

To summarize, we hold that the Court of Appeals and the district court erred in applying the economic loss doctrine to bar negligence claims brought by homeowners arising from the performance of residential construction services. Any language to the contrary in *Prendiville* or other cases is overruled. We remand to determine whether the plaintiffs allege any breach of a common-law or statutory duty that would form the basis of a negligence claim against Hett.

Reversed and remanded.