No. 101,940

KENNETH RINEHART and BEVERLY RINEHART, Individuals, and MIDWEST SLITTING, LC, *Appellees*, v. MORTON BUILDINGS, INC., *Appellant*.

(305 P.3d 622)

Opinion filed July 26, 2013.

*Greg L. Musil*, of Polsinelli Shughart PC, of Overland Park, argued the cause, and *G. Edgar James* and *Heber O. Gonzalez*, of the same firm, of Kansas City, Missouri, were with him on the briefs for appellant.

*Michael L. Entz*, of Entz, Entz & Laskowski, LLC, of Topeka, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

BILES, J.: Morton Buildings, Inc. challenges a Court of Appeals decision affirming an adverse jury verdict in a negligent misrepresentation case and assessing attorney fees for the appeal. Morton contends the economic loss doctrine, which originated with product liability litigation to prohibit tort claims when the only damages were to the product itself, should extend to bar the negligent misrepresentation claim in this case. Morton also objects to the attorney fee award, arguing it included time and expenses not reimbursable under the applicable statute. We affirm in part and reverse in part the Court of Appeals, and remand to the Court of Appeals for further proceedings.

We hold the economic loss doctrine does not bar negligent misrepresentation claims because the duty at issue arises by operation of law and the doctrine's purposes would not be furthered by extending it to such claims. We reverse and remand the attorney fee award for reconsideration by the Court of Appeals because we cannot determine from the record whether the panel limited the time and expenses to just the consumer protection issue as required by K.S.A. 50-643(e) and Supreme Court Rule 7.07(b) (2012 Kan. Ct. R. Annot. 66). For the same reasons, we deny on present

showing the application for attorney fees for the work performed before this court.

## FACTUAL AND PROCEDURAL BACKGROUND

Kenneth and Beverly Rinehart contracted with Morton for a preengineered building to serve as their personal residence and business location for their cellophane slitting company, Midwest Slitting, LLC. The Rineharts and the sales agent discussed the building's dual purpose during negotiations. The written contract is not in the appellate record, but it is agreed Midwest Slitting, as a corporate entity, was not a party to it.

Disputes arose during construction over the structure's quality. These clashes matured into litigation when the Rineharts refused payment because of dissatisfaction with Morton's attempts at repair, which caused Morton to file a mechanic's lien. The Rineharts and Midwest Slitting sued first, advancing various legal theories. Morton counterclaimed against the Rineharts to foreclose its mechanic's lien and recover the remaining balance on the contract. A jury returned a verdict for the Rineharts on their breach of contract and warranty claims, awarding them $108,017.13 in damages.

The jury also found for the Rineharts on their deceptive acts and practices claim under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq*. It determined Morton willfully misrepresented that the building complied with the plans and specifications and would include anchor bolts, roof fasteners, fire stops, a vapor barrier, and truss repairs. Based on that verdict, the district court held Morton committed unconscionable acts in violation of the KCPA. See K.S.A. 50-627(b) ("unconscionability of an act or practice is a question for the court"). This finding authorized the district court to award attorney fees to the Rineharts as the prevailing party on the KCPA claim. See K.S.A. 50-634(e) (court may award reasonable attorney fees to prevailing party on KCPA claim, including fees for appeal; award limited to fees for work reasonably performed). The district court awarded the Rineharts $45,000 in attorney fees after deducting approximately $6,500 of legal work the court attributed to Midwest Slitting's claims, which did not involve KCPA violations.

As for Midwest Slitting's negligent misrepresentation claims, it alleged Morton misrepresented that the building would be completed in a timely manner, accommodate Midwest Slitting's need to relocate its operations, and meet or exceed all industry standards. Midwest Slitting sought $218,349.65 in economic damages for shop rent at an alternate facility, lost production, relocation costs, and interest expenses on its line of credit. The jury found for Midwest Slitting and awarded $149,824.65. The verdict form did not require the jury to itemize how it calculated the award.

Finally, the jury rejected Morton's counterclaim against the Rineharts for mechanic's lien foreclosure and recovery of the remaining contract balance.

Morton timely appealed to the Court of Appeals, arguing: (1) the economic loss doctrine barred Midwest Slitting's negligent misrepresentation claims; (2) the alleged misrepresentations were not actionable; (3) the jury instructions for computing damages were improper; (4) the admission of certain photographs Morton contended were not provided during discovery was error; and (5) the holding that Morton committed unconscionable acts under the KCPA was error.

Relevant to this appeal, Morton argued the economic loss doctrine should apply to negligent misrepresentation claims involving construction projects on a "case-by-case basis," depending on the contract's nature and whether the doctrine's goals would be furthered. Morton then argued the doctrine should apply here because Midwest Slitting had an opportunity to bargain for contractual protections but did not. It also asserted that many of the doctrine's policy goals would be promoted by its application to Midwest Slitting's claims.

The Court of Appeals disagreed with Morton. It held the economic loss doctrine did not bar Midwest Slitting's claims because the company did not have a contract with Morton, *i.e.*, there was no contractual privity. *Rinehart v. Morton Buildings, Inc.*, No. 101,940, 2010 WL 4320353, at *4 (Kan. App. 2010) (unpublished opinion). The panel found unpersuasive Morton's argument that Midwest Slitting had an opportunity to bargain for contractual protections, noting Morton had the same opportunity to contractually

limit its liability and did not pursue it. 2010 WL 4320353, at *4. The panel then rejected Morton's remaining arguments. 2010 WL 4320353, at *5-10.

With their continued success with the KCPA claim, the Rineharts were allowed to seek attorney fees for that portion of their attorney's appellate work related to that issue. See K.S.A. 50-634(e). They applied to the panel for $15,593.94 in fees, citing the KCPA and Kansas Supreme Court Rule 7.07(b) (2012 Kan. Ct. R. Annot. 66), which allows an appellate court to award fees "in any case in which the trial court had authority to award fees." Morton argued the entire request should be denied because the motion's supporting affidavit itemized time spent on all claims, rather than just work on the KCPA and intertwined claims. In a two-sentence order, the panel granted the entire fee request, citing Supreme Court Rule 7.07(b). The order did not mention the KCPA.

Unsatisfied, Morton petitioned this court for review of two questions: (1) whether the economic loss doctrine bars Midwest Slitting's negligent misrepresentation claims; and (2) whether the panel erred by granting the Rineharts appellate attorney fees. We granted review on both issues under K.S.A. 20-3018(b) (review of Court of Appeals decision) and obtained jurisdiction under K.S.A. 60-2101(b). After oral argument with this court, the Rineharts submitted another motion seeking attorney fees for work performed for this appeal. Morton did not respond to that motion.

### ECONOMIC LOSS DOCTRINE

Morton did not seek review of the panel's holding that Midwest Slitting stated valid negligent misrepresentation claims. Accordingly, we start our analysis from the vantage point that Midwest Slitting properly stated—and the jury correctly found—valid claims against Morton. The only remaining legal question is whether the economic loss doctrine bars these otherwise valid claims.

The economic loss doctrine is a judicial creation. It first arose in the context of product liability litigation to prohibit tort claims for economic recovery when the only damages were to the product itself. But some jurisdictions expanded the doctrine's application to other circumstances. *David v. Hett*, 293 Kan. 679, 685-89, 270

P.3d 1102 (2011). In Kansas, its scope is still unfolding. Recognizing this, Morton asks us to extend the doctrine to bar Midwest Slitting's negligent misrepresentation claims against it.

As detailed below, the arguments here raise two issues of first impression: (1) whether parties must have contractual privity for the economic loss doctrine to apply; and (2) whether the doctrine extends to negligent misrepresentation claims. Regarding the first, Morton contends the doctrine should apply broadly to tort claims when the only damages asserted are economic loss. Midwest Slitting counters—and the Court of Appeals held—that the doctrine should not apply in this case because Midwest Slitting was not a party to Morton's contract with the Rineharts, *i.e.*, Midwest Slitting and Morton lacked privity of contract. *Rinehart*, 2010 WL 4320353, at *4. In effect, the Court of Appeals holding creates a bright-line rule that the doctrine does not apply when parties lack contractual privity.

Notably, the parties and the Court of Appeals both treat the negligent misrepresentation claims as if they are indistinguishable from simple negligence claims and argue the case from that perspective. But our resolution necessarily addresses whether negligent misrepresentation claims are different from simple negligence claims and considers the distinction. We affirm the Court of Appeals' determination that the economic loss doctrine does not apply to Midwest Slitting's claim. But we base our decision on the nature of the negligent misrepresentation tort, which contains its own scope-of-liability limits.

*Standard of Review*

Whether the economic loss doctrine applies in a case is an issue of law subject to unlimited appellate review. *David*, 293 Kan. at 682.

*Discussion*

The Court of Appeals held the economic loss doctrine does not bar Midwest Slitting's negligent misrepresentation claims because Midwest Slitting was not a party to the Morton contract. *Rinehart*, 2010 WL 4320353, at *4. The panel based that decision on what

it concluded was an absence of caselaw supporting Morton's claim that the economic loss doctrine may apply even when the parties have no contract. Believing Morton was asking it to extend the doctrine into unchartered waters, the panel declined the invitation. We begin with an abbreviated explanation of the economic loss doctrine and then delve into the merits of the parties' arguments.

### The Economic Loss Doctrine's Development

The economic loss doctrine's often-stated purpose is to preserve distinctions between tort and contract law. *David*, 293 Kan. at 688. And as we have previously observed, the doctrine is difficult to define. In the most expansive terms, it is " 'a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses.' " 293 Kan. at 683 (quoting *Indemnity Ins. Co. v. American Aviation*, 891 So. 2d 532, 536 [Fla. 2004]). But a much narrower definition reveals itself when the doctrine is traced backed to its roots in product liability law, where it emerged because courts became concerned the rise of implied warranties and strict liability for dangerous products would allow tort law to consume contract law. *David*, 293 Kan. at 685.

In its original form, the economic loss doctrine simply prohibited a commercial buyer of defective goods from suing in negligence or strict liability when the only injury consisted of damage to the goods themselves. *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 207, 960 P.2d 255, *rev. denied* 265 Kan. 885 (1998). The doctrine gained traction in many states after the United States Supreme Court adopted it in a product liability lawsuit arising from the Court's admiralty jurisdiction in *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986). The *East River* Court established the policy considerations most often recited as supporting the doctrine's adoption. This court previously summarized the facts in *East River* as follows:

"Seatrain Shipbuilding Corp. contracted with Transamerica Delaval, Inc. to design, manufacture, and supervise installation of four turbines on four oil-transporting supertankers. After completion, Shipbuilding transferred title to another entity, which in turn chartered the ships to others. After three supertankers were

in use, a turbine malfunctioned on one but damaged only the turbine. Two other supertankers were inspected and similar damage discovered, requiring repair and replacement parts. The fourth ship was completed after the problem was discovered, and it did not experience the same issue; but its turbine was damaged because a part was incorrectly installed, requiring different repairs.

"Shipbuilding and the charterers initially sued in breach of contract, warranty, and tort, but the statute of limitations barred the contract and warranty claims. Shipbuilding dropped its lawsuit, but the charterers amended their complaint to allege five tort claims. The first four asserted that Delaval was strictly liable for design defects that damaged the turbines on three ships. The fifth claim alleged Delaval negligently supervised installation of the part that was incorrectly installed on the fourth vessel. The charterers sought damages for the cost incurred to repair the supertankers and their lost income." *David*, 293 Kan. 686-87.

The *East River* Court framed the issue as "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." 476 U.S. at 866. And it summarized the concern that product liability law would consume contract law if its expansion was not somehow limited, famously stating that if product liability law "were allowed to progress too far, contract law would drown in a sea of tort." 476 U.S. at 866. To limit that expansion, the Court adopted the economic loss doctrine to bar a plaintiff's negligence and strict liability claims when a product malfunctions, damaging itself and causing only economic loss. 476 U.S. at 876.

This court noted three justifications from the *East River* Court for limiting product liability law in that fashion:

"The [*East River*] Court found the concern for individual safety was reduced when the only damage was to the product because the cost arising from that damage was significantly less than personal injury and much easier to anticipate. It also noted that economic damages to a commercial user when a product injures itself were limited to the product's lost value, customer displeasure, and increased costs of performance. These economic losses, the Court found, were easily insured and the societal cost for holding a manufacturer liable in tort unjustified. [Citation omitted.]

"Second, the *East River* Court held that contract and warranty law were better suited for commercial controversies when the only damage was to the product because the claim at issue was more naturally viewed as a contract claim arising when the product failed to meet a customer's expectations. It also found contract law was the better fit because it allowed parties to allocate their respective risks

by agreement. In other words, the manufacturer could limit its liability by disclaiming warranties and the purchaser, in turn, could negotiate a lower price. This analysis hinged, however, on the Court's recognition that 'a commercial situation generally does not involve large disparities in bargaining power.' [Citation omitted.]

"Third, the *East River* Court held that permitting the imposition of tort liability for the economic losses suffered by parties not in privity with the manufacturer, such as the charterers and subcharterers, would sanction indefinite damages beyond the confines of the commercial contract, and the Court concluded that the law does not stretch that far. [Citation omitted.]' " *David*, 293 Kan. at 687-88.

Applying those considerations, the *East River* Court held the economic loss doctrine barred the charters' and subcharters' strict liability and negligence claims. 476 U.S. at 876.

After *East River*, many jurisdictions embraced the economic loss doctrine and extended its application beyond the commercial product liability sphere under the guise of preserving distinctions between contract and tort law. See *David*, 293 Kan. at 688. But determining when the doctrine is appropriately applied outside the product liability sphere has proven difficult, and there is some sense the doctrine's application has expanded too far. See 293 Kan. at 689. In response to that concern, some courts developed a variety of exceptions or approaches to limit the doctrine's application. See, *e.g.*, *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995) (doctrine not applicable to transactions in services); *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262-64 (Colo. 2000) (adopting the independent duty rule); *McCarthy Well Co. v. St. Peter Creamery*, 410 N.W.2d 312, 315 (Minn. 1987) (when the Uniform Commercial Code does not apply, there is no reason for the economic loss doctrine to apply).

The Kansas Court of Appeals, relying on *East River*, embraced the economic loss doctrine for the first time in a commercial product liability setting. See *Koss Construction*, 25 Kan. App. 2d at 207. Later decisions from that court expanded the doctrine's application beyond that setting. See *Jordan v. Case Corp.*, 26 Kan. App. 2d 742, 743-44, 993 P.2d 650 (1999) (extending doctrine to consumer product liability setting) *rev. denied.* 269 Kan. 933 (2000); *Prendiville v. Contemporary Homes, Inc.*, 32 Kan. App. 2d 435, 83 P.3d 1257 (extending doctrine to homeowner's residential construction

claims), *rev. denied* 278 Kan. 847 (2004), *overruled by David*, 293 Kan. 679, Syl. ¶ 2.

This court's first venture into the waters of the economic loss doctrine came in 2011 with *David*. We held the doctrine does not bar a homeowner's claims to recover economic damages caused by negligently performed residential construction services, overruling a contrary Court of Appeals holding in *Prendiville*. *David*, 293 Kan. at 699-700. *David* provides some guidance here. Acting as their own general contractors for a home construction project, the Davids contracted with Hett to perform excavation, basement, and concrete work required by the Davids' plans and specifications. Several years after the home was completed, the house experienced unusual settling in the garage and basement areas. The Davids sued Hett under numerous theories, including that Hett negligently performed the contractually required work. The Davids sought damages for economic loss, but the district court and the Court of Appeals held the economic loss doctrine barred the Davids' claims. We disagreed. 293 Kan. at 703.

The *David* court reasoned that applying the doctrine in the residential construction context would not further the *East River* policy rationales because: (1) service contracts lack the warranty protections afforded goods under the Kansas Uniform Commercial Code; (2) unlike commercial transactions, residential construction contracts rarely involve only sophisticated parties with equal bargaining power; and (3) using the consequence or damages, rather than the duty breached, as a litmus test for whether the doctrine applies may lead to unfair results—one contractor may escape liability imposed on others simply because the contractor's negligence is discovered before it causes injury to a person or other property. 293 Kan. at 699-700. The *David* court noted Kansas has long held homeowners could sue a contractor in contract, warranty, and tort. See 293 Kan. 697-98.

It is also worth mentioning *David* did not hold that homeowner tort claims in residential construction scenarios are without limitation. We simply determined the economic loss doctrine would not be used to enforce the boundary between tort and contract in

that instance. Instead, we reiterated the test Kansas courts use to decide whether a claim arises in tort or contract, stating:

> "Whether a claim sounds in tort or contract is determined by the nature and substance of the facts alleged in the pleadings. [Citations omitted.] A breach of contract claim is the failure to perform a duty arising from a contract, and a tort claim is the violation of duty imposed by law, independent of the contract. [Citation omitted.] But the fact that the parties have a contractual relationship does not necessarily control the inquiry because legal duties may arise even though the parties also have a contract, so that ' "[w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of circumstances surrounding or attending the transaction, the breach of the duty is a tort." ' [Citations omitted.]" 293 Kan. at 701.

The *David* court's narrow holding established one circumstance in which the economic loss doctrine does not apply. But it left unanswered whether this court would affirm the Court of Appeals' adoption of the economic loss doctrine in commercial product liability actions based on the *East River* analysis or the Court of Appeals' subsequent expansion of that doctrine into other areas. Those questions must be examined as the opportunities present themselves.

### Negligent Misrepresentation

Midwest Slitting claims—and a jury found—that Morton misrepresented that the building would be completed in a timely fashion, accommodate Midwest Slitting's business operations, and meet or exceed industry standards. Morton argues that as a matter of sound policy it should not be liable in tort for those misrepresentations because Midwest Slitting only suffered economic loss and that Midwest Slitting's failure to contract with Morton precludes recovery.

The parties do not focus on the nature of negligent misrepresentation claims in general, but we must do so to understand the full implications of their arguments. This court has adopted the tort of negligent misrepresentation as described in the Restatement (Second) of Torts § 552 (1976). *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994). The tort is defined as follows:

" '(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

" '(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

" '(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.' " 255 Kan. at 604 (quoting the Restatement § 552).

The elements of a negligent misrepresentation claim by their design restrict liability by imposing a legal duty only in limited circumstances—when a defendant supplies information to guide others in business transactions in the course of that defendant's business. In other words, this tort confines the universe of potential claimants to those for whose benefit the defendant supplied the information and whom the defendant intended to influence. Westerbeke, *Survey of Kansas Tort Law: Part II*, 50 U. Kan. L. Rev. 225, 278 (2002) ("These limitations reasonably restrict the number of potential plaintiffs and thus negate fear of unlimited liability.").

And within that restricted context, one seeking damages on a negligent misrepresentation theory must show: (1) The person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating it; (2) the party receiving the false information reasonably relied on it; and (3) the person relying on the false information is a person or one of a group of persons for whose benefit and guidance the information is supplied or a person or one of a group of persons to whom the person supplying the information knew the information would be communicated by another; and (4) the party receiving the information suffered damages. PIK Civ. 4th 127.43. Importantly, it can be seen

that we do not require privity of contract as an element for this cause of action, nor have we said the existence of contractual privity bars the tort.

In *Mahler*, which first adopted the Restatement § 552 definition, a third-party home purchaser sued the seller's real estate agent, with whom the purchaser was not in contractual privity, for negligent misrepresentation. 255 Kan. 593, Syl. ¶¶ 2-3; see also *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083 (2013) (action for damages against seller's real estate agent); *Osterhaus v. Toth*, 291 Kan. 759, 249 P.3d 888 (2011) (same); *Johnson v. Geer Real Estate Co.*, 239 Kan. 324, 720 P.2d 660 (1986) (action for damages against a Kansas real estate broker brought by real estate purchasers). In *Gerhardt v. Harris*, 261 Kan. 1007, 1021-22, 934 P.2d 976 (1997), we distinguished negligent misrepresentation from misrepresentation of intention to perform an agreement. We held the plaintiff there could not recover on a negligent misrepresentation theory from her former attorney on account of the attorney's alleged promise to abide by an arbitration committee's decision. Allowing a promise to perform to serve as the basis of a negligent misrepresentation claim might mean "any breach of contract claim action could be treated as also including a negligent misrepresentation claim." 261 Kan. at 1021. Similarly, in *Bittel v. Farm Credit Svcs. of Cent. Kansas, P.C.A.*, 265 Kan. 651, 665, 962 P.2d 491 (1998), we held a borrower could not sue a lender for negligently representing that a loan would be renewed. These cases are instructive because the outcome did not turn on contractual privity. Each hinged on context.

Morton does not address how applying the economic loss doctrine to bar Midwest Slitting's claim would impact negligent misrepresentation cases in Kansas—either generally or in those instances in which the parties lack contractual privity. Instead, Morton urges the doctrine's application by analogy to a product liability case, *Northwest Arkansas Masonry, Inc. v. Summit Specialty Products, Inc.*, 29 Kan. App. 2d 735, 31 P.3d 982, *rev. denied* 272 Kan. 1419 (2001). In that case, plaintiff Northwest was a masonry subcontractor. Mortar made with defendant's cement did not harden properly, requiring Northwest to demolish and rebuild

some walls constructed with the mortar. Northwest sued in strict liability and obtained a jury verdict against the cement's manufacturer and packager. The district court set aside the strict liability verdict, holding the economic loss doctrine barred the damages. Northwest appealed, arguing in part that the economic loss doctrine did not apply when the plaintiff lacks a contractual remedy. A Court of Appeals panel noted the Kansas Product Liability Act applied to strict liability claims, but that the parties had not considered the Act's effect. 29 Kan. App. 2d at 742. It then held the economic loss doctrine barred Northwest's strict liability claim even though the parties lacked contractual privity, stating:

"First, notwithstanding *East River*, [476 U.S. 858,] under the Kansas Product Liability Act, both direct and consequential economic loss are not included as recoverable 'harm.' K.S.A. 60-3302(c). Second, 'some forms of economic loss have traditionally been excluded from the realm of tort law even when the plaintiff has no contractual remedy for a claim.' Restatement (Third) of Torts: Products Liability § 21, comment a (1998). Finally, consumers are not typically in privity of contract with the manufacturer when they purchase products from retailers or wholesalers. Nevertheless, the economic loss rule applies equally to consumer purchasers. [Citation omitted.]" 29 Kan. App. 2d at 745.

The *Northwest Arkansas Masonry* court's holding is consistent with the *East River* Court's analysis. Both cases involve commercial product liability claims and in neither case did the plaintiffs have contracts with the defendants. Yet in both, the economic loss doctrine barred the plaintiffs' claims. As one commentator summarized, the doctrine's boundary-line purpose is not always furthered when the parties lack contractual privity:

"If there is no agreement between the parties to a lawsuit, there is no risk that recognizing tort obligations will violate the parties' freedom to contract, because there never was an effort to exercise such freedom. If the parties are not in privity, contract law does not potentially afford a remedy, except in the relatively rare case of a third-party beneficiary. Thus, respect for contract principles and private ordering does not require that the economic loss rule bar the claims of persons not standing in a contractual relationship. The purpose of the economic loss rule is not to leave injured persons remediless for economic losses but to ensure respect for private ordering by relegating a plaintiff to contract remedies in cases where there is an agreement between the parties allocating economic risks. If there is no contract between the parties to litigation, there is no boundary-line function to be performed by the economic loss rule." Johnson, *The Boundary-*

We decline Morton's invitation to extend the economic loss doctrine to bar Midwest Slitting's negligent misrepresentation claims based on the *Northwest Arkansas Masonry* court's analysis. That case is easily distinguished because it involved a manufacturer's defective product and the Court of Appeals grounded its rationale for applying the economic loss doctrine in the statutory framework governing product liability claims. Moreover, a bright-line rule prohibiting the doctrine's application in cases in which the parties lack contractual privity would have wide-ranging consequences, since that particular fact arises in a variety of contexts, including the product liability claims detailed above. Instead, our analysis must focus on the nature of the negligent misrepresentation tort.

In *David*, we cited the absence of remedies under the Uniform Commercial Code (U.C.C.) as a reason the economic loss doctrine should not bar the residential construction claims alleging negligence. 293 Kan. at 699-700. The same rationale applies here because the U.C.C. does not govern Midwest Slitting's negligent misrepresentation claims. K.S.A. 2012 Supp. 84-1-103(b) (U.C.C. does not displace fraud and misrepresentation claims); see also U.C.C. § 1-103(b), 1 U.L.A. 14 (2012) (same). In deciding *David*, we also analyzed whether the three *East River* policy rationales for applying the economic loss doctrine to a commercial product liability action supported the doctrine's application in that case. 293 Kan. at 687-88, 699-700. We adopt the same analysis here.

Morton cites the following policies for adopting the economic loss doctrine in its case: (1) allows a case-by-case inquiry into whether a claim sounds in tort or contract; (2) encourages parties to insure against risk, maintaining a distinction between contract and tort, and protecting a party's freedom to allocate risks through a contract; (3) considers whether a tort claimant had the opportunity to bargain and contract for protection but did not avail itself of that opportunity; (4) "analyz[es] whether the claimed failure (here an alleged promise to build a building on time) more clearly invokes tort law"; and (5) allows a review of the claimed damages

to determine if they are economic loss—"the core concern of traditional contract law." But as noted above, liability limitations are necessarily woven into the fabric of a negligent misrepresentation claim. See Restatement (Second) of Torts § 552; *Mahler*, 255 Kan. at 604.

The elements of the negligence misrepresentation tort sets the bounds on the scope of liability by imposing the duty in the limited circumstances when a defendant supplies information to guide others in business transactions in the course of the defendant's business. The tort also limits the universe of those who may pursue such claims to those for whose benefit the defendant supplied the information and whom the defendant intends to influence or knows will be influenced in the transaction. Westerbeke, 50 U. Kan. L. Rev. at 278. Therefore, the doctrine's second purpose of restricting potential extensive liability to a commercial user "downstream" from the manufacturer does not apply here.

Finally, Morton claims Midwest Slitting should have bargained for protections and did not. But this seems to advocate a rule requiring parties to enter a contract or risk having no rights at all. And as the Court of Appeals correctly points out, there is an inequity to this argument because Morton also had the opportunity to limit its liability by contracting with Midwest Slitting but did not. *Rinehart*, 2010 WL 4320353, at *4.

We hold negligent misrepresentation claims are not subject to the economic loss doctrine because the duty at issue arises by operation of law and the doctrine's purposes are not furthered by its application under these circumstances. We leave for another day whether the doctrine should extend elsewhere. We affirm the panel's determination that the doctrine does not bar Midwest Slitting's negligent misrepresentation claims, although our rationale differs.

## APPELLATE ATTORNEY FEE AWARD

The Rineharts moved both the Court of Appeals and this court for their appellate attorney fees under Kansas Supreme Court Rule 7.07(b) (2012 Kan. Ct. R. Annot. 66) and K.S.A. 50-634(e). The Court of Appeals granted the request, and Morton petitioned for

review of that order. Morton did not respond to the Rineharts' motion for fees in this court.

Generally, a Kansas court may not award attorney fees unless authorized by statute or party agreement. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 161, 298 P.3d 1120 (2013); *Unruh v. Purina Mills*, 289 Kan. 1185, 1200, 221 P.3d 1130 (2009). Whether a court may award attorney fees is a question of law subject to an appellate court's unlimited review. 289 Kan. at 1200. If a court lawfully awards fees, the amount awarded is reviewed for abuse of discretion. 289 Kan. at 1200. In their motions for appellate attorney fees, both to the Court of Appeals and this court, the Rineharts argue Kansas Supreme Court Rule 7.07(b) and K.S.A. 50-634(e) authorize the awards they seek.

Interpretation of a Supreme Court rule is a question of law subject to unlimited review. *Fischer v. State*, 296 Kan. 808, 814-15, 295 P.3d 560 (2013). Rule 7.07(b) authorizes appellate courts to award attorney fees "for services on appeal in a case in which the district court had authority to award attorney fees." K.S.A. 50-634(e) states:

"[T]he court may award to the prevailing party reasonable attorney fees, *including those on appeal*, limited to the work reasonably performed if:

(1) . . . a supplier has committed an act or practice that violates this act and the prevailing party is the consumer; and

(2) an action under this section has been terminated by a judgment, or settled." (Emphasis added.)

K.S.A. 50-634(e) authorizes reasonable attorney fees associated with the Rineharts' KCPA claim, which was just one of several issues Morton raised to the Court of Appeals. Morton acknowledges the Court of Appeals has recognized a court may award fees "[i]f the party can satisfactorily show that some work was essential to and intertwined with both claims that allow a fee and those that don't." *Thoroughbred Associates v. Kansas City Royalty Co.*, 45 Kan. App. 2d 312, 337, 248 P.3d 758 (2011) (citing *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, Syl. ¶ 2, 947 P.2d 1039 [1997]), *rev. granted on other grounds* December 19, 2011. Morton makes no argument that this recognition is in error, so we will proceed on that basis.

*The Court of Appeals Motion*

The Rineharts sought $15,593.94 in appellate attorney fees in the Court of Appeals. Their motion's supporting affidavit included some time entries that could be intertwined with the KCPA claim, such as those related to the settlement from February 19, 2009. But other entries are so generically classified one cannot determine whether the work related to the KCPA claim, such as the December 2009 entries entitled "worked on brief." Most important for our purposes is one $157.50 charge, dated September 13, 2010, for an entry styled "Reviewed some of the cases relied upon by Morton regarding application of the economic loss rule." Clearly that charge is distinct from the KCPA claim.

But the Court of Appeals granted the Rineharts' motion in its entirety, stating simply: "Motion for attorney's fees by appellee . . . granted in the amount of $15,593.94 *pursuant to Rule 7.07(b)*. Response Noted." (Emphasis added.) This award necessarily included the $157.50 for work done on Morton's economic loss doctrine argument, which signals a problem. We do not see how this entry can relate to the KCPA claim, and the panel's two-sentence order is inadequate to determine if it even considered whether all the fees requested were intertwined with the Rinehart's KCPA claim.

On review, Morton continues to argue K.S.A. 50-634(e) only permits the Rineharts to recover fees related to their KCPA claim or issues intertwined with it, and that the five issues on appeal were not intertwined with the KCPA claim. Morton asserts the panel erred by awarding the full amount requested and should have denied the fee request in its entirety. We agree with Morton in part.

The Court of Appeals acted under Rule 7.07(b), not K.S.A. 50-634(e). This creates a question whether the rule's broad language allowing appellate courts to award fees in any *case* in which the district court could award them authorizes an appellate court to award fees for all appellate work—even work for which the district court could not lawfully award fees—if two conditions are met: (1) The district court could have awarded fees on any claim in the proceedings below; and (2) the moving party submits the required affidavits. We reject this broad reading of Rule 7.07.

We agree with the Court of Appeals that an attorney fee award for appellate work was authorized. But the panel's order is too vague for review. Accordingly, we remand to the panel to determine whether the fee award is limited to work directly related to the KCPA claim, as provided by K.S.A. 50-634(e), or so intertwined with it as to merit inclusion. We hold Supreme Court Rule 7.07(b) does not provide greater authority to award attorney fees than K.S.A. 50-634(e).

*Supreme Court Motion*

The Rineharts moved this court for an additional $4,550 in attorney fees for 26 hours of work related to the proceedings on review. But the motion's supporting affidavit suffers from the same infirmities as their fee application to the Court of Appeals. For example, the Rineharts apply for time related exclusively to the economic loss doctrine issue—work which is not eligible for such an award under K.S.A. 50-634(e). Accordingly, we deny the motion as presented.

Within 10 days of the date this decision is filed, the Rineharts may resubmit to this court their motion for attorney fees relating to their partially successful defense of the Court of Appeals' fee award. After all, Morton claimed in these proceedings that the Rineharts forfeited their right to attorney fees because of the insufficient affidavit. We have rejected that argument and remand the issue to the panel for further proceedings, which still will result in the Rineharts receiving a fee award. The Rineharts have prevailed under the KCPA to that limited extent. Morton may respond within 10 days of the Rineharts resubmission of their application.

The judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals with directions. The judgment of the district court is affirmed.