NOT DESIGNATED FOR PUBLICATION

No. 114,995

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MICHAEL E. MESKER, CORTNEY AST,
and JESSICA HOAG,
*Appellants*,

v.

BILL E. MESKER, Individually
and as Trustee of the
GINGER MESKER, LIVING TRUST,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID L. DAHL, judge. Opinion filed February 10, 2017.
Affirmed.

*Glenn D. Young, Jr.*, and *Jerry D. Bogle*, of Young, Bogle, McCausland, Wells, & Blanchard,
P.A., of Wichita, for appellants.

*Kurt A. Harper*, of Sherwood, Harper, Dakan, Unruh & Pratt, LC, of Wichita, for appellee.

Before BRUNS, P.J., MCANANY and BUSER, JJ.

*Per Curiam*: This appeal arises out of an unfortunate family dispute in which one
of the children and two of the grandchildren of 95-year-old Bill Mesker have sued him
over his management of his late wife's living trust. The appellants—Michael Mesker and
his two adult daughters, Cortney Ast and Jessica Hoag—are successor beneficiaries of
the Ginger Mesker Living Trust. Several other successor beneficiaries of the trust who
are also members of the Mesker family are not parties to this lawsuit. On appeal, the

1

appellants contend that the district court erred in failing to find that their father and grandfather breached his duties as trustee by invading the principal of the trust. In addition, they contend that the district court erred in failing to adequately compensate their attorney for uncovering the alleged breach. Because we find no merit in either of these contentions, we affirm the judgment of the district court.

FACTS

Bill and Ginger Mesker were married in 1943. Prior to their marriage, Bill served in the United States Navy. Following World War II, Bill invested in or started numerous businesses and real estate ventures in and around Wichita. Ginger played an active role in many of these ventures and the couple began to accumulate assets. However, due to the nature of their investments, cash flow was often an issue.

The couple were blessed with three children—Gary (who is now deceased), Michael, and Pamela. After their children were adults, the couple became interested in the possibility of creating living trusts to protect their assets. As such, they sought advice from Wichita attorney Larry Meeker, who primarily practiced in the areas of estate planning, tax planning, and business law. In 1992, Mr. Meeker drafted two marital living trusts for the Meskers—the Bill Mesker Living Trust and the Ginger Mesker Living Trust. At the time, Bill was 71 years old and Ginger was 68 years old.

The two living trusts were substantially similar, if not mirror images of each other. Specifically, both were "Qualified Terminable Interest Property" (QTIP) trusts. As long as both of the Meskers survived, they were to serve as co-trustees of the living trusts. Upon the death of the grantor, however, all of the income realized by the trust was required to be distributed to the surviving spouse. In addition, the surviving spouse would become the sole trustee.

2

Unfortunately, Ginger died on November 2, 1995. As a result of Ginger's death, Bill—at the age of 74—became the sole trustee of Ginger's trust. Moreover, as the surviving spouse, Bill was obligated to take all of the income from the trust. If, in any given year, Bill took less than all of the trust income, he was required to catch up and take the balance of the income. In the event that Bill took more income than was permitted under the terms of the trust, he was obligated to either pay it back to the trust or credit it towards income in subsequent years.

In addition, as the sole trustee of Ginger's trust, Bill had the discretion to supplement his income from the trust principal in the event that his income and property was insufficient to provide for his health, support, and maintenance in the manner to which he had been accustomed during the marriage. Furthermore, as trustee, Bill had "all those powers granted to trustees under the Uniform Trustees' Powers Act, Chapter 58, Article 12, Kansas Statutes Annotated . . . ." This included the power to make loans.

Ultimately, upon Bill's death, the trust assets were to be distributed to Bill and Ginger's surviving children and grandchildren as successor beneficiaries. Each of the successor beneficiaries at the time of Ginger's death were provided with a copy of the Ginger Mesker Living Trust. Evidently, some of the children and/or grandchildren mistakenly believed that they would derive benefits from the trust at that time. Although this was not accurate, Bill made a number of gifts to his children and grandchildren following Ginger's death.

Bill made gifts from Ginger's trust to his children in the amounts of $23,000 to Gary, $15,000 to Michael, and $76,000 to Pam. It appears that Bill also made other substantial gifts to his children and grandchildren between 2005 and 2012. However, it is difficult to determine from the record what funds given to the children and grandchildren may have come from the trust and what funds may have come from Bill's personal assets. Nevertheless, as the district court noted, Bill provided substantial financial support to

3

members of his family, including the appellants. In fact, Bill continued to make significant gifts to his children and grandchildren—even after being sued by Michael, Courtney, and Jessica.

In addition to advising Bill about the mandatory distribution of income requirement in the trust agreement, Mr. Meeker advised Bill that he could borrow money from, and provide a promissory note to, the trust. Bill also received assistance from Myleena Roberts—employed by the Meskers since 1987—who served as the bookkeeper for Ginger's trust. About a year after Ginger's death, Bill and Myleena were married. Since that time, Myleena has continued to keep track of the income, distributions, loans, and transactions related to the trust.

At the time of Ginger's death, the value of the trust property was approximately $1.1 million. While serving as sole trustee, Bill borrowed substantial funds from the trust to facilitate real estate and other business transactions as well as to pay taxes, debts, and mortgages. A review of the record on appeal reveals that Bill either repaid the funds that he borrowed from the trust, or he provided promissory notes for the loans. According to Mr. Meeker, a loan to a solvent surviving spouse—with an at-demand note due in the future—is consistent with the administration of the type of QTIP trust he designed to benefit Ginger and Bill. From time-to-time, Bill would repay the trust either in cash or through the transfer of real estate. As of September 30, 2014, Bill continued to owe the trust a substantial sum of money. However, Ginger's estate tax return also reflects a significant amount payable to Bill.

It appears that the controversy that led to the filing of this lawsuit arose in 2011. Around that time, Michael became concerned that the trust assets were depleted. After an investigation, Michael, Courtney, and Jessica filed suit against Bill—individually and in his capacity as trustee—on February 14, 2013. After the completion of discovery, the district court held a bench trial from April 21 to April 24, 2015.

4

At trial, the parties presented the testimony of ten witnesses—including expert witnesses—and the trial court admitted numerous exhibits into evidence. After both sides rested, the district court agreed to delay its decision to allow the parties to submit suggested findings of fact and conclusions of law by September 11, 2015. Finally, on September 18, 2015, the district court heard closing arguments and took the case under advisement.

On October 30, 2015, the district court filed a comprehensive 16-page journal entry of judgment. The journal entry included 56 findings of fact and 25 conclusions of law. Among other findings of fact, the district court found:

"(5) Larry Meeker is an expert in trusts of this nature . . . .

. . . .

"(7) The Ginger Mesker Trust, which is the focal point of this dispute, was a QTIP Trust. . . . The purpose of a QTIP Trust is twofold. One aim is to leave a portion of the estate to someone other than a spouse. The second aim is to take full advantage of the marital deduction in estate tax law. Therefore, taxes on these trusts would be decreased and the assets received by beneficiaries would be increased.

"(8) In particular, a result of Ginger's trust is that on the death of the grantor (Ginger in this case), all of the income realized by the trust thereafter was required to be distributed to the surviving spouse, and only the surviving spouse (Bill, in this case).

"(9) Another typical feature of a QTIP trust is to permit the surviving spouse to withdraw the principal under certain situations. Such is the case with Ginger's trust.

"(10) Ginger and Bill were not sophisticated in creating or administrating their QTIP trusts. That is one of the reasons why an expert was consulted and hired to draft the trust agreements. The subtleties of those trusts are beyond the grasp of many people, particularly in this case.

5

. . . .

"(14) Ginger's Trust does not permit Bill to distribute any income or principal to anyone but himself.

"(15) After Bill and Ginger both pass away, Ginger's Trust would terminate and the remaining assets will be distributed in four equal shares, one-fourth each to Bill and Ginger's three children, with the remaining one-fourth divided between Bill and Ginger's grandchildren.

. . . .

"(17) At the time of Ginger's death, the value of her Trust was approximately $1.1 million. The current value of Ginger's trust is $1.1M, but part of that value is comprised of notes payable from Bill to Ginger's trust.

. . . .

"(20) Bill made significant gifts to his children and grandchildren. Those gifts continued even after this lawsuit was filed.

"(21) Following Ginger's death, Bill as the surviving spouse, was obligated to take all of the income from Ginger's Trust. In any given year, if he took less than all of the income, he was obligated to catch up and take the balance of the income. If Bill took more income than was permitted under the trust, he was obligated to either pay it back, or credit it towards a subsequent year's income.

. . . .

"(23) In addition to advising Bill regarding the mandatory distribution of income from the Trusts, Larry Meeker advised Bill that if he discovered he had withdrawn amounts from the Trust in excess of the income, he should prepare a document demonstrating that the surplus withdrawal was a loan, which was also permitted under the Trust document.

6

"(24) It is Larry Meeker's opinion that the Uniform Trustee's Powers Act, or the Uniform Trust Code, provided a statutory authorization for [loans from the trust.] This is found in Section 12(a) of the Trust, where the Uniform Trustee's Powers Act, which empowers a trustee to make loans, is incorporated into Ginger's Trust.

. . . .

"(28) Although Bill was advised by Larry Meeker in 1999 that he should not make distributions from Ginger's Trust to his children or anyone other than himself, Bill continued to help his children substantially in a number of ways. Many of Bill's acts of generosity, however, were not authorized by Ginger's Trust.

. . . .

"(30) In approximately 2011, Bill's son, Mike, and Mike's two daughters, Courtney and Jessica, became concerned about the status and efficacy of Ginger's Trust. Questions were raised by Mike and his daughters; discord ensued and quickly escalated into suspicion. And thus began the schism between these three family members and Bill.

"(31) Neither of Bill's other two children nor any of the other grandchildren joined the plaintiffs in this lawsuit. Testimony would uniformly suggest that the other potential beneficiaries do not concur with the position taken by the plaintiffs.

"(32) Highly skilled experts testified at trial about the value of the Trust and Bill's financial behavior. As is often the case, the testimony differed greatly, but was all considered by the court.

"(33) Payments to Bill's children and grandchildren were able to [be] traced, for the most part, through trust accounts, Myleena's analysis and the testimony of experts.

"(34) Before Ginger's death, she and Bill provided financial help to their issue, including the plaintiffs. Significant financial help from Bill to his issue continued after Ginger's death.

7

. . . .

"(43) Bill borrowed substantial funds from Ginger's Trust for matters unrelated to Ginger's Trust, such as to facilitate real estate and other business deals and to pay taxes, debts and mortgages. Money was repaid or notes given to Ginger's Trust by Bill. Bill always considered transactions with Ginger's Trust to be loans.

. . . .

"(45) According to Larry Mesker, a loan to a seemingly solvent surviving spouse with a demand note due in the future, whether any interest is required or not, is consistent with the administration of the type of QTIP trust designed for Bill and Ginger. There was no evidence that Bill was insolvent.

"(46) Bill repaid Ginger's Trust from time to time, both in cash and through the transfer of real estate.

"(47) Bill still owes a substantial amount of money to Ginger's trust. As of September 30, 2014, that indebtedness from Bill to Ginger's Trust was $745,600.28.

. . . .

"(49) In the eight years before suit was filed (2005-12), Bill made the following transfers to family members, further demonstrating his lack of malice, willfulness, wantonness or fraud:

| | |
|---|---|
| a. Gary and Katy | $ 152,622.77 |
| b. Pam | $ 274,363.42 |
| c. Jessica | $ 12,950.00 |
| d. Cortney | $ 13,350.00 |
| e. Mike | $ 90,373.32 |

"(50) Bill made gifts to his children from Ginger's Trust in the amounts of $76,000 to Pam, $23,000 to Gary and $15,000 to Mike for a total of $114,000 from Ginger's trust. While beyond the scope of Bill's trust authority, it is ironic that Mike

8

condemns Bill for making payments to Mike himself. The Court will decline to impose a significant sanction for these payments, which in no way benefitted Bill.

. . . .

"(55) Ginger's Estate Tax Return reflects a payable to Bill in the amount of $154,857.

"(56) Over the years, Myleena kept track of income for Ginger's Trust, distributions to Bill, and whether he had withdrawn more than its income."

In its conclusions of law, the district court determined that:

"(57) Plaintiffs are not entitled to punitive damages under any theory, including but not limited to K.S.A. 60-3701 *et seq*.

. . . .

"(59) Plaintiffs are not entitled to receive any Form of Interest because all Interest in Ginger's Trust is Payable to Bill.

. . . .

"(60) Except for premature distributions to his children, Gary, Pam and Mike, Bill did not invade Principal in a manner contrary to the terms of Ginger's Trust, or otherwise breach any duty under the Uniform Trust Code, or in any other fashion.

> A. The Trusts designed by Larry Meeker as the estate planning documents for Bill and Ginger were designed to maximize the access of a surviving spouse to all income realized from the property of the first spouse to die, and to maximize access on the part of that surviving spouse to the assets of the spouse first to die.

9

B. Bill did not breach any common law fiduciary duties to any of the other beneficiaries. He has been entitled to receive all income from the Trust at all times during his life since the death of Ginger. He has kept, personally or with the assistance of Myleena, a complete and accurate record of all transactions reflecting all distributions of income and any distributions of principal. He has documented most distributions of principal with corresponding promissory notes. The value of the principal has remained substantially intact.

. . . .

D. The value of the combined Trusts is approximately $1.1 million; which is substantially the same value of the Trust in 1995 when Ginger died. There has been no net consumption of the principal.

E. Bill has always administered the Trust in good faith consistently with K.S.A. 58a-801 and 58a-802. His good faith is demonstrated by Myleena's record keeping, documentation of major transactions with promissory notes, and Bill's lifelong efforts to provide financial support to his children and grandchildren, including each of the Plaintiffs.

. . . .

G. . . . There is no persuasive evidence that Bill failed to conform to the appropriate standard.

H. The transactions put in issue by the Plaintiffs herein do not breach Bill's duty of loyalty pursuant to K.S.A. 58a-802, because the transactions were authorized by the terms of the Trust except for the premature distributions to his children, Gary, Pam and Mike. . . .

. . . .

10

P. Bill shall pay the Plaintiffs' attorneys fees in an amount not to exceed $25,000. There shall be a separate hearing on or before October 27, 2015, to determine the amount of those fees.

. . . .

"(64) Bill Mesker's withdrawals of principal from Trust did not violate the Kansas common law prohibition against self-dealing.

. . . .

"(70) Bill Mesker was constrained by ascertainable standards pursuant to K.S.A. 58a-814. Except for the premature distributions to his children, Gary, Pam and Mike, he did not violate these standards.

. . . .

"(72) Bill Mesker shall be removed as Trustee of the Ginger Mesker Trust and an independent institutional trust company, Trust Company of Kansas, shall be appointed as successor trustee. K.S.A. 58a-1001 (b)(10). Ginger's Trust shall be responsible for all fees associated therewith, which shall not be reimbursed by the defendants.

. . . .

"(78) Ginger's Trust shall be $1.1 million, and shall be reconciled as follows:

. . . .

b. The defendants shall . . . repay their indebtedness to Ginger's trust in an amount not to exceed $745,600 . . . ."

On November 30, 2015, Michael, Cortney, and Jessica timely filed a notice of appeal. Although Bill initially filed a cross-appeal, he acquiesced in the judgment of the district court by repaying those amounts to the trust ordered by the court. Thereafter, the

11

cross-appeal was voluntarily dismissed. On December 16, 2015, Michael, Courtney, and Jessica filed a motion to alter or amend the district court's order with regard to attorney's fees. The district court denied this motion on December 23, 2015.

ANALYSIS

*Issues Presented*

The appellants present two issues on appeal. First, whether the district court erred in failing to find that Bill had breached his duties as trustee. Second, whether the district court erred in failing to adequately compensate plaintiffs' counsel for uncovering the alleged breach of trust.

*Breach of Duty as Trustee*

An appellate court reviews a district court's factual findings under the substantial competent evidence standard. Hence, it is not the function of this court to reweigh the evidence or to pass on the credibility of witnesses. If the evidence supports the judgment, we are not to disturb it on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, Syl. ¶ 12, 266 P.3d 516 (2011). Conclusions of law based on those facts, however, are subject to unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

The appellants contend that Bill violated his duties as trustee by invading the principal to finance and profit his personal business ventures. However, after weighing the evidence presented at trial, the district court determined that the transactions undertaken by Bill did not rise to the level of a breach of his duty of loyalty under K.S.A. 58a-802. Specifically, the district court found that the assets of the trust at the time of Ginger's death were valued at approximately $1.1 million and they are still valued at

12

approximately $1.1 million. The district court also found that Bill—with the assistance of Myleena—kept track of income from the trust, distributions from the trust, loans from the trust, and whether he had withdrawn more from the trust than its income.

Based on hearing the testimony presented at trial and reviewing the exhibits introduced into evidence, the district court found that the transactions the appellants complained of were, in fact, authorized by the terms of the trust agreement with the exception of some premature gifts Bill made from trust assets to his children and grandchildren. Moreover, as the district court found, a trustee is authorized to make loans out of trust property, including to beneficiaries, for the benefit of the trust. See K.S.A. 58a-816(18).

As the district court found, the appellants also received these gifts from the trust and, if anything, they showed Bill's generosity and good faith in consideration of the interests of the successor beneficiaries. In fact, the district court noted the irony—as do we—that Mike, Courtney, and Jessica complain about Bill's generosity to his family when he was under no obligation to do so. This is particularly ironic when the appellants and other family members get to keep the money prematurely advanced from the trust while Bill has to reimburse the amount advanced.

Much of the authority cited by the appellants deal with independent trustees—those who are not themselves beneficiaries. Here, of course, Bill is both a trustee and—until his death—is the sole, primary beneficiary of the trust. As the district court found, however, under the terms of the QTIP trust that is the subject of this case, Bill not only was entitled to the income from the trust, but also the trustee was required to distribute the trust income to him as the surviving spouse. Even if the district court had required Bill to repay the funds borrowed from the trust with interest, he would have been obligated, under the terms of the trust, to distribute the interest to himself, because it would be considered income.

13

It is also important to note that no witness—neither expert nor lay—testified that Bill violated any applicable standard of care. In fact, it is questionable what standard of care Bill owed since he was not serving as a professional trustee. In fact, the district court expressly found that neither Bill nor Ginger were "sophisticated in creating or administering their QTIP trusts." As such, they relied heavily on their estate-planning attorney, Larry Meeker, who the district court found to be "an expert in trusts of this nature. . . ." Mr. Meeker testified at trial that the purpose of the QTIP trusts he drafted for Ginger and Bill was to maximize the surviving spouse's access to all of the property the couple accumulated during their marriage. Furthermore, he testified that it was consistent with this purpose that the surviving spouse would be able to borrow money from the trust. Likewise, Mr. Meeker testified that Bill's actions in borrowing money and giving promissory notes in exchange was consistent with the legal advice he had provided to the Meskers.

The appellants also argue that Bill failed to satisfy the "ascertainable standards" set forth in the trust agreement. See *Hemphill v. Shore*, 295 Kan. 1110, 289 P.3d 1173 (2012). As noted above, however, most of the transactions in question were loans authorized by the QTIP trust. Moreover, there is evidence in the record to support the position that due to the nature of Bill's business, he lacked the liquidity on several occasions to pay taxes or other bills. Accordingly, we have no reason to replace our judgment for that of the district court, which specifically concluded that "Bill Mesker met the trust's ascertainable standards."

The appellants suggest that it was inconsistent for the district court to find that Bill exercised good faith in the administration of the trust but also removing him as trustee. However, K.S.A. 58a-706(b)(3) grants courts the authority to replace a trustee for, among other reasons, unfitness of the trustee to administer the trust effectively. Moreover, a district court's decision to remove a trustee is a matter within its sound discretion. *Rodriguez-Tocker v. Estate of Tocker*, 35 Kan. App. 2d 15, 34-35, 129 P.3d 586 (2006).

14

We cannot say it was unreasonable for the district court to replace a 95-year-old trustee. This is particularly true because the district court found that Bill was not sophisticated in the administration of trusts with a professional trustee. It also is reasonable to assume that the professional trustee can not only administer the trust during Bill's remaining years, but it can also help with the distribution of the trust assets to the successor beneficiaries on Bill's death. Thus, we find no abuse of discretion nor do we find Bill's removal as trustee under the circumstances presented to be inconsistent with the district court's finding that Bill had not breached his duties as trustee nor his duties to the successor beneficiaries.

In summary, we conclude that substantial evidence exists to support district court's findings of fact and conclusions of law. We also conclude that the district court appropriately interpreted the law as well as the terms of the Ginger Mesker Living Trust. Although this elderly gentleman may have mistakenly advanced some funds from the trust to family members who ultimately will be entitled to receive the assets of the trust in any event, this does not necessary equate to a lack of good faith or a breach of his duties as trustee. In light of our conclusion upholding the district court's determination that Bill Mesker did not breach his duties as trustee as well as his acquiescence in the judgment of the district court, we do not need to reach the question of remedies.

*Attorney Fees*

The second issue presented by the appellants is the district court erred in failing to adequately compensate their lawyers. In trust adjudication, a district court may award attorney fees to any party. See K.S.A. 58a-1004. Once it is determined that the district court had authority to grant attorney fees, an appellate court reviews the district court's decision under an abuse of discretion standard. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 81, 350 P.3d 1071 (2015); *Rinehart v. Morton Buildings, Inc.*, 297 Kan. 926, 942, 305 P.3d 622 (2013). The district court has wide discretion to determine

15

the amount and recipient of attorney fees. *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, 203-04, 235 P.3d 515 (2010). The district court abuses its discretion when no reasonable person would take the view adopted by the district court. *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006).

Here, the district court required Bill to pay $25,000 of the appellant's attorney fees. The appellants, however, believe that amount is inadequate and request us to increase the attorney fees award. Although the appellants argue that $25,000 is too low, they do not request a specific amount of fees. Evidently, the appellants' attorneys have spent 1286 hours working on this case. However, we cannot determine based on the information supplied to us what amount was reasonable and we believe the district court was in the best position to determine the amount of attorney fees—if any—to be awarded in this case. It is also important to remember that the appellants did not prevail on a significant number of their claims against Bill. Thus, we cannot say that the district court abused its discretion in its award of attorney fees.

Affirmed.